ESTATE OF HARRY BRITENSTOOL, DECEASED, BY MANUFACTURERS HANOVER TRUST COMPANY (SUCCESSOR BY MERGER TO THE HANOVER BANK), AS SOLE SURVIVING EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4170-64. Filed September 2, 1966.

*Harold J. Raby,* for the petitioner.
*Charles M. Costenbader,* for the respondent.

SIMPSON, *Judge:* The respondent determined a deficiency in estate tax in the amount of $69,204.58. There are three issues remaining for decision: (1) Whether a payment by the estate in satisfaction of a claim against the estate approved by a State court is deductible under section 2053, I.R.C. 1954;[1] (2) whether the payment by the estate of 2 months' rent on decedent's apartment after his death is deductible under section 2053 as an administration expense; and (3) whether, in computing the amount of a charitable deduction when there has been an election under section 642(g) to deduct administration expenses in computing the income of the estate rather than in computing the taxable estate and when the income beneficiary is required under State law to reimburse a charity for a reduction in a charitable contribution resulting from such election, the charitable contribution includes the amount of such reimbursement.

#### FINDINGS OF FACT

Some of the facts were stipulated, and those facts are so found.

Petitioner is the sole, surviving executor of the Estate of Harry Britenstool, who died on March 7, 1960, a resident of New York, N.Y. The last will and testament of decedent was admitted to probate in the Surrogate's Court, New York County, on March 23, 1960. Under

---

[1] All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.

the provisions of the will, decedent's sister, Blanche B. Ostheimer, and Manufacturers Hanover Trust Co. (then the Hanover Bank) were appointed executors.

The estate tax return for the estate of the decedent was filed by the executors with the district director of internal revenue, Manhattan, New York, on June 7, 1961. Blanche B. Ostheimer (Ostheimer) died on May 12, 1963, and no successor as executrix was appointed thereafter.

The total gross estate of the decedent, valued as of the date of decedent's death, amounted to $2,288,595.27. Under the terms of decedent's will, Ostheimer received a cash legacy of $100,000, together with all of the decedent's personal effects. All of the rest of decedent's estate was placed in trust with Ostheimer having the right to the income during her lifetime and the power to invade the corpus up to $10,000 in any one year. Upon her death, the corpus was to go to the following charitable remaindermen in the proportions indicated: 60 percent to the Hospital for Joint Diseases; 10 percent to St. Claire's Hospital; 15 percent to the trustees of Columbia University in the City of New York; and 15 percent to the Federation of Jewish Philanthropies of New York. The decedent's will provided that all estate taxes be paid out of his residuary estate.

Petitioner claimed on the estate tax return as a deductible debt $23,177.39 paid by the estate to Blanche B. Ostheimer. Ostheimer asserted, as the basis for the claim, that she had advanced her personal funds to pay medical and other expenses of the decedent during his lifetime.

Ostheimer resided with decedent in a 12-room apartment leased by decedent. Decedent was a medical doctor, and a part of the apartment was used as his office. Ostheimer's claim against decedent's estate included payments for food, rent, household expenses, medical expenses, and electricity, during a period prior to decedent's death. Since Ostheimer resided with the decedent, she also received some benefit from these payments.

Ostheimer was not reimbursed by decedent during his life for any of the payments, although the payments were made over a 6-year period prior to his death. She made the payments from her personal checking accounts, although she held a power of attorney to draw checks on decedent's checking account. Decedent's checking account contained ample funds at all times to make the payments.

In support of her claim, Ostheimer submitted to petitioner a schedule of the claimed payments. Prior to payment of the claim, petitioner examined this schedule and also examined decedent's checkbooks for a 3-year period to ascertain whether there was any duplication be-

tween payments listed in the schedule and payments listed in the checkbooks. No duplication was found.

After examining Ostheimer's claim, petitioner, by letter in February of 1961, sought the approval of the charitable beneficiaries in order to make payment without awaiting the accounting and the approval of the Surrogate's Court. The charitable beneficiaries approved the claim, and petitioner then paid the claim in its face amount of $23,177.39.

The charitable beneficiaries under the will of decedent had reason to believe that they would also be charitable beneficiaries under the will of Ostheimer, whose personal wealth was estimated to be in excess of $2 million. In fact, the charitable beneficiaries were identical under both wills.

After paying Ostheimer's claim and after her death, petitioner filed a petition, verified October 26, 1964, in the Surrogate's Court of the County of New York, for the settlement of the first intermediate account of the decedent's estate. Among other things, the petitioner specifically asked the court to confirm and approve payment of Ostheimer's claim "on the merits as a bona fide obligation of decedent's estate."

A hearing was held before the surrogate on February 26, 1965, at which the charitable beneficiaries filed appearances. Testimony was taken by the surrogate in support of the allowance of Ostheimer's claim. Following the hearing, the Surrogate's Court rendered a decision and decree, entered March 24, 1965, in which the court-approved payment of the claim in the amount of $23,177.39.

Petitioner, at the time Ostheimer submitted her claim, did not see fit to question her honesty, since she was coexecutor, as to whether specific claimed expenditures were her personal expenses or for the benefit of decedent. In preparing this case for trial, petitioner's counsel discovered that three checks of Ostheimer's represented her personal expenses rather than expenditures on behalf of decedent. Other errors in Ostheimer's claim can be found in the schedule she submitted in support of her claim and in her personal checkbooks. Accordingly, the petitioner now concedes that, even accepting the validity of Ostheimer's claim, only $22,051.28 should have been paid her.

In addition to the claim of Ostheimer pertaining to the payment of decedent's expenses during his lifetime, Ostheimer submitted a claim to petitioner for reimbursement of payments made by her for 2 months' rent of the apartment, after decedent's death. Under the lease of the apartment, the decedent was required to give 2 months' notice prior to the termination of the tenancy. After decedent's death, Ostheimer, who remained in the apartment until her death on May 12,

1963, paid the April and May 1960 rent, amounting to $1,200. Petitioner paid this amount to Ostheimer, and the payment was allowed by the surrogate as an administration expense. Petitioner claimed this $1,200 payment as an administration expense on decedent's estate tax return.

Pursuant to the provisions of section 642(g), the executors of the estate waived the right to have administration expenses totaling $102,061 allowed as deductions for the purpose of determining estate tax liability under sections 2053 and 2054. The waived amount of administration expenses was claimed on the estate's income tax returns.

In connection with the decision of the executors to deduct administration expenses from estate income, the income deficiency, Ostheimer, agreed to reimburse the charitable remaindermen for any increase in estate tax resulting from the waiver of the right to claim such administration expenses for estate tax purposes. The surrogate's decree approving the first intermediate account provided that the additional estate taxes arising from the use of certain administration expenses as deductions from gross income be allocated against Ostheimer.

In computing the charitable deduction on the estate tax return, the petitioner included in such deduction the amount for which petitioner then estimated that Ostheimer was obligated to reimburse the charitable remaindermen. This amount was $35,537.54, but the actual amount of Ostheimer's reimbursement cannot be ascertained until the estate's final estate tax liability is determined.

OPINION

The first issue that we shall consider is the deductibility from the value of the gross estate of the payment in the amount of $23,177.39 by petitioner in satisfaction of Ostheimer's claim against the estate.

Respondent contends that the claim of Ostheimer is not a claim against the estate deductible under section 2053. Respondent argues that petitioner has failed to prove that the decedent was under a legally enforceable obligation to repay Ostheimer for the expenditures listed in her claim and that, even if a legally enforceable obligation existed, no deduction is allowable for the repayment of expenditures that were for the benefit of Ostheimer since no consideration in money or money's worth was received by the decedent.

Petitioner argues that its payment to Ostheimer in the amount of $23,177.39 should be allowed in full as a deductible debt of the estate since payment was made only after careful investigation and substantiation of the claim and particularly since the Surrogate's Court having jurisdiction of the administration of the estate specifically approved payment of the claim.

Section 2053 (a) allows a deduction from the value of the gross estate for such amounts for claims against the estate as are allowable by the laws of the jurisdiction under which the estate is being administered. Section 2053(c) then limits such a deduction to the extent that the claim against the estate, when founded on a promise or agreement, was "contracted bona fide and for an adequate and full consideration in money or money's worth."

We must first consider the effect that should be given to the approval of petitioner's payment of Ostheimer's claim by the Surrogate's Court of the county of New York. The effect to be given State court decrees in Federal tax litigation is a question that has caused much confusion and uncertainty. See the discussion and citations in *Commissioner* v. *Estate of Herman J. Bosch*, 363 F. 2d 1009 (C.A. 2, July 6, 1966), affirming 43 T.C. 120 (1964). A basic proposition is that when the issue requires an interpretation of a provision of Federal law, no effect is given a State court decision which undertakes to interpret such a provision. *Gallagher* v. *Smith*, 223 F. 2d 218 (C.A. 3, 1955); Sacks, "The Binding Effect of Nontax Litigation in State Courts," 21st Ann. N.Y.U. Tax Inst. 277 (1963). On the other hand, if the issue in the Federal tax litigation involves a determination of the rights of the parties to income or other property, a State court decision adjudicating those rights may be given conclusive effect, in the absence of fraud or collusion. This principle is based, of course, on the assumption that the State court had jurisdiction of all parties who claimed an interest in the income or property and that the State court did in fact adjudicate the rights of all parties.

Section 2053 contains both types of provisions. Section 2053(a) makes a deduction from the value of the gross estate for claims against the estate dependent upon State law. A deduction is allowed only for claims "allowable by the laws of the jurisdiction under which the estate is being administered." Since the decree of the Surrogate's Court did allow Ostheimer's claim, we must examine the proceeding to see if for any reason we should not accept that court's determination. In addition, section 2053(c) imposes another limitation. A deduction, even though the claim is allowable under State law, is limited to the extent that the claim, when founded on a promise or agreement, was contracted "bona fide and for an adequate and full consideration in money or money's worth." This is a Federal criterion, and even if a State court should apply this criterion, its application would not be binding in later Federal tax litigation. *Gallagher* v. *Smith, supra; Estate of Hugo Goldsmith*, 36 B.T.A. 1201 (1937); 4 Mertens, Law of Federal Gift and Estate Taxation, sec. 26.19 (1959).

The Surrogate's Court of the county of New York allowed Ostheimer's claim in the amount of $23,177.39 as a part of the settlement of the executor's first intermediate account. The claim had previously

been paid by petitioner after petitioner had received the consent of all beneficiaries of the estate. In the petition for settlement of the first intermediate account, petitioner specifically asked that payment of the claim "be confirmed and approved on the merits as a bona fide obligation of decedent's estate." A hearing was held on this petition approximately 4 months later. All beneficiaries filed appearances, and testimony was taken by the surrogate. Approximately 1 month after the hearing, the surrogate approved payment of the claim.

Respondent contends that the effect of the surrogate's decree is neutralized by the fact that it was consented to by the only parties in interest, the charitable beneficiaries, who were also the expectant, and subsequently the actual, beneficiaries of Ostheimer's personal estate exceeding $2 million. In other words, there was no adversary State court proceeding regarding allowance of the claim.

In *Estate of Herman J. Bosch*, 43 T.C. 120 (1964), a State court had determined that an attempted partial release by the wife of a decedent of a general power of appointment was a nullity. There were possible adverse parties to the proceeding, but all briefs filed with the State court urged the same position—that which the court ultimately took. The Tax Court decided to accept the State court decision as an adjudication of the property rights involved but did not decide whether it was "bound" to do so. The Court did not base its decision solely upon the adverseness or lack of adverseness in the State proceedings but took a balanced view of all relevant considerations.

This approach is sound. The degree of adverseness may affect the independence and deliberativeness of a court decision, and to the extent that it diminishes such consideration, doubt is cast upon the wisdom of another court following that decision.

It may be that the charitable remaindermen were faced with conflicting considerations. We do not know what motivated them to assent to the payment of the claim. Nonetheless, we know that they had an interest adverse to the payment of the claim, and yet, they assented. We have considered the lack of adverseness in the proceedings before the Surrogate's Court, but we can find no indication that this lack in any way affected the independence of that court in reaching its decision.

There are two considerations in this case that lead us to believe that we should follow the decree of the Surrogate's Court, at least in large part. The first of these considerations is simply that the Surrogate's Court decided that Ostheimer was entitled to the $23,177.39 that she claimed. This amount was in fact paid by petitioner. If we should now decide that Ostheimer was not entitled to that money, it might be that we would be denying a deduction for a payment that was made and that cannot be recovered. The Surrogate's Court in effect decreed that the money was Ostheimer's and not the estate's. If we

disregard this decree, we would be imposing a tax on property that has been determined by a State court as not belonging to the estate. This is a consideration that should not be taken lightly and indeed has been highly persuasive, absent collusion, in many cases. E.g., *Flitcroft* v. *Commissioner*, 328 F. 2d 449 (C.A. 9, 1964), reversing 39 T.C. 52 (1962) ; *Gallagher* v. *Smith, supra; Eisenmenger* v. *Commissioner*, 145 F. 2d 103 (C.A. 8, 1944), reversing 44 B.T.A. 489 (1941).

The second consideration that we find persuasive is that the surrogate's decision could not have been motivated by an objective of any of the parties to save Federal taxes. Allowance of the claim by the Surrogate's Court in effect decreased the taxable estate by $23,177.39. But if the Surrogate's Court had disallowed Ostheimer's claim, the $23,177.39 would have become part of the charitable remainder and would have been deductible as such.

However, if we should now decide that the Surrogate's Court should not have allowed Ostheimer's claim, the estate would be entitled to no deduction for payment of the claim and yet would not be entitled to a charitable deduction increased by the $23,177.39 since Ostheimer (now her estate) would still have the money. Accordingly, that amount would now be subject to estate tax even though it would not have been had the Surrogate's Court disallowed the claim.

In summary, we have decided that the surrogate's decision should generally be accepted as establishing the allowability of the claim under New York law.

There is one exception to our decision to follow the State court decree. We will accept the decree as only establishing the validity of the claim in the amount of $22,051.28. In preparing this case for trial, petitioner discovered certain errors in Ostheimer's claim. Three checks that Ostheimer claimed represented payments on behalf of decedent were in reality for her own personal expenses. A number of other errors, most of them minor in amount, were discovered by petitioner.

Decedent's checkbooks, Ostheimer's checkbooks, and the schedule that Ostheimer presented to petitioner in support of her claim were all introduced into the record of this case. These exhibits are voluminous. The claim represented frequent payments over a 6-year period. We are not surprised that some errors occurred, and generally, they do not affect the approval of the claim by the Surrogate's Court.

However, we have benefited from an analysis of the claim that was not made available to the Surrogate's Court. Errors that had been made were brought to our attention. We cannot overlook these errors. Accordingly, we accept the decree of the Surrogate's Court as establishing the validity of Ostheimer's claim in the amount of $22,051.28.

As we have previously stated, section 2053 also contains a peculiarly

Federal criterion. Section 2053(c) limits the allowable deduction to the extent that the claim against the estate, when founded on a promise or agreement, was "contracted bona fide and for an adequate and full consideration in money or money's worth."

No suggestion has been made that Ostheimer's claim was not founded on a promise or agreement. Nor has any suggestion been made that her claim was not contracted bona fide. Her claim was necessarily based on at least an implied understanding or agreement that decedent would reimburse her for the expenditures in question, and we are satisfied that such an understanding or agreement arose in good faith with no elements of deceit or fraud. Therefore, since the Surrogate's Court decided that decedent was legally obligated to repay Ostheimer, we have only to look to the adequacy of the consideration flowing from her. Ostheimer made payments that we have found to amount to $22,051.28. This is her consideration; this it what she did in return for his promise to reimburse her. It certainly is full and adequate consideration in money or money's worth. Respondent's argument that Ostheimer derived some benefit from the payments goes to the validity of her claim; that is, to the extent that Ostheimer made payments for her personal benefit, decedent is not obligated to repay her. But the Surrogate's Court established the validity of the claim.

We accordingly find that petitioner is entitled to a deduction from the value of the gross estate in the amount of $22,051.28 paid to Ostheimer in satisfaction of her claim against the estate.

The second issue for decision is whether the administration expense in the amount of $1,200 claimed on the estate tax return for 2 months' rent of the decedent's apartment is an allowable deduction under section 2053(a)(2).

Petitioner objected to consideration of this issue since the issue was not raised by respondent in the notice of deficiency or in the pleadings. The first notice to petitioner that respondent might contest the rental payments was in the stipulation of facts prepared before the trial by the parties. The respondent there stated that the $1,200 payment was not conceded to be an allowable deduction. The respondent then, in his opening statement at trial, put the rental payments in issue. Petitioner made no objection at that time, and without objection, a witness testified as to the issue.

Petitioner objected for the first time in his brief to respondent's assertion of this additional deficiency, stating that "respondent's objection to the payment at this late date is somewhat less than timely." Petitioner then stated that "we do not, however, hesitate to address ourselves to the merits of the deduction."

Section 6214(a) provides that the Tax Court shall have jurisdiction to determine a deficiency greater than the amount stated in the

notice of deficiency if the Secretary or his delegate asserts a claim therefor at or before the hearing. We believe that respondent's informal claim was sufficient to satisfy this requirement.

Petitioner does not contend that he would be surprised or prejudiced by our consideration of the issue, and this Court has in the past treated an informal statement as an amendment to the answer. *A.B.C.D. Lands, Inc.*, 41 T.C. 840 (1964); *William C. Baird*, 25 T.C. 387 (1955). Since the respondent made a claim that gave the petitioner adequate notice, we will consider the deductibility of the payments.

The decedent died on March 7, 1960, and his will was admitted to probate on March 23, 1960. Under the terms of decedent's lease of his apartment, decedent was required to give 2 months' notice prior to the termination of the tenancy. After decedent's death, Ostheimer remained in the apartment and paid the April and May 1960 rent.

Respondent has the burden of proof as to this issue since the issue was not raised in the notice of deficiency. Rule 32, Tax Court Rules of Practice. *Beck Chemical Equipment Corporation*, 27 T.C. 840 (1957), acq. 1957–2 C.B. 3. Respondent's only argument with regard to the issue is that the rental expense could only be Ostheimer's expense as she was the occupant of the apartment.

Petitioner argues that the estate was obligated to pay the rent for this 2-month period and would have been so obligated no matter who occupied the apartment. Ostheimer was an occupant of the apartment and not a cotenant. Therefore, petitioner argues that although the estate could have evicted Ostheimer from the premises or could have sublet the apartment to her for 2 months, the estate had no duty or obligation to do either.

The payment by the estate to Ostheimer of the $1,200 as reimbursement of her payment of the 2 months' rent was allowed by the Surrogate's Court. While petitioner does not argue that we must accept the decree of the Surrogate's Court as to this expense, we, in accord with our opinion in regard to Ostheimer's other claim against the estate, see no reason to depart from that decree. The rental payments were a necessary expense that benefited the estate—the lease required 2 months' notice—and 2 months was not an unreasonable time for the estate to carry this expense.

Accordingly, the $1,200 administration expense is an allowable deduction from the value of the gross estate.

The final issue to be decided is whether petitioner correctly computed the amount of the charitable deduction for the remainder interests in the residuary trust. All of decedent's estate, except $100,000 and personal effects, was placed in trust with Ostheimer having the right to the income during her lifetime and the power to invade corpus up to $10,000 in any 1 year; the remainder would then go to charity. Pursuant to section 642(g), administration expenses totaling $102,061

were claimed as deductions on the estate's income tax returns rather than on the estate tax return. The effect of this election by the executors was to increase the amount of Federal estate tax due and in turn decrease the amount of the charitable remainder. Because of this effect, the Surrogate's Court, pursuant to established principles of New York law,[2] "allocated" the increase in estate tax, amounting to approximately $35,537.54, against Ostheimer, who had agreed to reimburse the estate for this increase. Accordingly, the charitable remaindermen received the same amount that they would have received had the administration expenses been deducted from the gross estate on the Federal estate tax return.

Respondent argues that the amount received from Ostheimer was in effect received from her "purchase" from the estate of the right to claim administration expenses as income tax deductions. Hence, respondent argues that the approximately $35,537.54 did not pass from the decedent to charity, and the estate is consequently not entitled to a charitable deduction for this amount.

Petitioner argues that under New York State law, the charitable remaindermen were entitled to receive an amount computed on the basis that the executors would pay the minimum amount of Federal estate tax. In other words, since the executors made an election for Federal estate tax purposes that would reduce the remainder going to charity and that gives some benefit to the income beneficiary of the trust, that beneficiary is required by New York law to reimburse the estate so that the charity receives the amount to which it is entitled. Thus, petitioner argues that Ostheimer purchased nothing; State law required her to pay the resulting increase in Federal estate tax.

We agree with petitioner. Charity received from the estate the amount to which it was entitled under New York law. The estate should therefore receive a charitable deduction for this amount. It is true that the estate incurred an additional estate tax liability for Ostheimer's benefit, but the estate was repaid for incurring such a liability. The result to the estate and to the charitable remaindermen was the same as if the election had not been made.

There is a suggestion in respondent's brief that the issue should depend upon whether under New York law Ostheimer "reimbursed" the estate or whether the increased estate tax was "allocated" against her account. That is, if Ostheimer reimbursed the estate, the source of the $35,537.54 that ultimately went to charity was Ostheimer; but if the $35,537.54 was allocated against her account, then under State

_____
[2] *In re Warms' Estate,* 140 N.Y.S. 2d 169 (Surr. Ct. 1955); *In re Levy's Estate,* 167 N.Y.S. 2d 16 (Surr. Ct. 1957); see also N.Y. Pers. Prop. Law, sec. 17-e(1), effective June 1, 1965.

law, she, and not the charitable remaindermen, was chargeable with a portion of the estate tax, and that portion should not reduce the charitable remainder.

We do not believe that the term used in describing the satisfaction of Ostheimer's obligation should make any difference. In our opinion, the important factor is that State law provided that the remaindermen should receive the remainder interest decreased by the minimum amount of Federal estate tax payable. State law accordingly provided that even if because of an election made pursuant to the Internal Revenue Code, the Federal estate tax payable should be increased, the portion of the estate passing to the remaindermen should not be diminished. The effect of State law, regardless of the term used to describe the mechanics of complying with such law, was to charge against the charitable bequest not the entire amount of Federal estate tax due but only the amount that would have been due had administration expenses been deducted from the gross estate.

Respondent claims that his position is supported by the decisions which hold that the income of an estate cannot be used to pay claims or administration expenses in order to increase the charitable or marital deductions. *Estate of Edward H. Luehrmann*, 33 T.C. 277 (1959), affd. 287 F. 2d 10 (C.A. 8, 1961); *Republic National Bank of Dallas*, 39 T.C. 85 (1962), affd. 334 F. 2d 348 (C.A. 5, 1964); *Alston* v. *United States*, 349 F. 2d 87 (C.A. 5, 1965); *Waldrop* v. *United States*, 137 F. Supp. 753 (Ct. Cl. 1956). However, these cases are distinguishable from the case before us.

In *Estate of Edward H. Luehrmann*, administration expenses were paid out of income and were claimed as deductions on the estate's income tax returns but not on the estate tax return. Local law required such expenses to be paid from corpus. Yet, since such expenses were charged to income, the taxpayer contended that they should not be considered to reduce the corpus, the income from which, after a life estate, would go to charity. The Court found that the amount of the charitable deduction depended upon local law and held that it could not be increased by the income beneficiary's voluntarily assuming the administration expenses. In the present case, charity is entitled under New York law to a certain amount computed on the basis of payment of minimum Federal estate tax. Charity in fact received this amount, and the estate's election under section 642(g) did not affect receipt of this amount. The obligation of Ostheimer to reimburse the estate (or have allocated against her account) the $35,537.54 did not increase, out of the income of the estate, the amount of the charitable bequest. It merely assured that the amount going to charity would not be diminished by the section 642(g) election.

In *Republic National Bank of Dallas*, the Government contended that a residuary charitable bequest had to be reduced by the amount

of the administration expenses regardless of whether or not such expenses were paid out of the corpus or the income of the estate and regardless of on which return the administration expenses were claimed as deductions. However, the Court found that the administration expenses were, in fact, paid out of the corpus and not out of income. The Court then stated that even if the expenses had been paid out of income, they would have been paid out of money to which the life beneficiary was entitled, and therefore the payment would have constituted a contribution by her to the charity and not by the estate. However, the present case is distinguishable because Ostheimer did not voluntarily add to the contributions received by charities; in fact, she only did what the law required of her. The charities received no additional contributions beyond those to which they were entitled under the will and the law.

In *Alston*, the court held that administration expenses must be deducted from the gross estate in computing a charitable remainder even though such expenses were paid out of post-mortem income and deducted on the estate's income tax return. This case, too, merely holds that a charitable contribution may not be increased by a voluntary payment of the administration expenses out of other property.

In *Waldrop*, income from the estate was used to pay expenses and estate taxes so that the residuary estate could be left to charity. The gross estate of the decedent was not sufficient to pay all bequests, expenses, and taxes and still leave something for charity. Hence, there would have been no payment to charity had income not been used. The court held that the estate was not entitled to a charitable deduction. But in the present case, income was not being used as a means of making a gift to charity to which the charity would otherwise not be entitled.

Our result is in accord with section 2055(c), which provides that if the Federal estate tax is, either by the terms of the will or by local law, payable in whole or in part out of a charitable bequest, then the amount of the charitable deduction is the amount of the bequest reduced by the amount of such tax. Decedent's will provided that the estate tax be paid out of the residue of his estate. However, *In re Warms' Estate*, 140 N.Y.S. 2d 169 (Surr. Ct. 1955), and *In re Levy's Estate*, 167 N.Y.S. 2d 16 (Surr. Ct. 1957), provide that where such tax chargeable against corpus is increased by reason of an election under section 642(g), the beneficiary who benefits from the election must "reimburse" the estate for the increase in tax. Therefore, the Federal estate tax is, by local law, payable in part out of the charitable bequest and in part out of Ostheimer's interest, and the charitable deduction is reduced by the part of the estate tax payable out of such bequest.

Accordingly, we find that the charitable remainder should be computed by including in such remainder the amount received from Ostheimer as a reimbursement for the benefit she derived from the use of administration expenses as a deduction in computing the income of the estate.

In order to reflect computations required by this opinion and the agreement of the parties concerning other adjustments in the notice of deficiency,

*Decision will be entered under Rule 50.*