Dixie Fowler, also known as Dixie Hassell v. Commissioner. John E. Fowler v. Commissioner.
Fowler v. Commissioner
Docket Nos. 4226-64, 4398-64.
United States Tax Court
T.C. Memo 1967-36; 1967 Tax Ct. Memo LEXIS 222; 26 T.C.M. (CCH) 175; T.C.M. (RIA) 67036; February 28, 1967
Paul F. Loveridge, 4th Floor, United California Bank Bldg., 1010 N. Main St., P.O. Box 1495, Santa Ana, Calif., for the petitioner in docket No. 4226-64. Paul F. Marx, 2006 N. Broadway, Santa Ana, Calif., for the petitioner in docket No. 4398-64. Richard L. Fishman, *224 for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Docket
Petitioner
No.
Year
Deficiency
John E. Fowler
4398-64
1959
$29,058.05
1960
5,179.05
Dixie Fowler
4226-64
1959
16,580.53
1960
4,153.00
1961
1,760.01 Respondent disallowed certain depreciation deductions in Docket No. 4398-64 in 1960, but the petitioner in that case, John E. Fowler, did not contest such disallowances, and we therefore assume he has conceded their correctness. Respondent disallowed certain deductions in Docket No. 4226-64 for reasonable additions to a reserve for bad debts in 1960 and 1961, but he has conceded on brief that the petitioner in that case, Dixie Fowler, is entitled to the deductions as claimed. As a result there is no longer any deficiency in Dixie's case for 1961. The cases were consolidated for trial and decision because they involved common questions of law and fact. The questions left for our consideration are: 1. Did the income of a retail house trailer business include amounts credited to dealer reserve accounts *225 by financial institutions upon the sale to them of conditional sales contracts executed by customers? 2. What portion of the income from the trailer business was community property of the petitioners? Findings of Fact Some of the facts have been stipulated and are so found. John E. Fowler and Dixie Fowler resided in Orange County, California, and filed separate Federal income tax returns for the years in issue with the district director of internal revenue, Los Angeles, California. Beginning in 1958 and throughout the years in issue John was in the business of selling house trailers as a sole proprietor. He had established the business with $19,048 which was his separate property. Most of his sales were on credit. The consummation of a credit sale involved several steps. John and his customer first agreed upon a "total cash price." This was the price that would have been payable had the customer paid cash. In part payment of the total cash price the customer made a down payment in cash or trade-in or both. To the remaining balance of the cash price was added the cost of insurance on the trailer for the payment period, any fees to be paid to public officials, and an additional *226 amount called the "finance charge" or "time-price differential." The sum of these items was referred to as "the contract balance." It was divided by the number of months over which payment was to be made to determine the amount of each monthly installment. John and the customer executed a conditional sales contract reflecting these computations. John did not possess sufficient capital to extend the credit required for volume sales. As a result he followed the practice of selling customer contracts to various financial institutions. During the years in issue he dealt with three banks and two finance companies. In every case the financial institution computed the purchase price of the paper by subtracting from the face amount of the contract balance a charge for its services, which charge was always less than the amount of the finance charge (the "time price" differential). The financial institution credited the remainder of the finance charge to a dealer reserve account in John's name and paid the remainder of its purchase price for the paper to him in cash. A typical credit sale followed by a sale of the customer contract is represented by the following figures: I. Sale of trailer: *227 Cash price
$5,000
Accessories
200
Sales tax
208
1.
Total cash price
5,408
2.
Total down payment
1,600
3.
Unpaid balance
$3,808
4.
Insurance
100
5.
Department of motor vehicles
92
6.
Total unpaid balance
4,000
7.
Time price differential (6% per
annum for 5 years)
1,200
8.
Contract balance
5,200 II. Sale of contract: Financial institution discount
$1,000
Credited to dealer reserve
200
Paid to dealer
4,000
$5,200
John kept his books and records on what he calls a hybrid method of accounting making specific charge-offs for bad debts, and computed his income for tax purposes in accordance therewith. The amount of the total unpaid balance (item 6 above) was taken into income upon execution of the contract. Upon sale of the contract, the financial institution paid to John in cash an amount equal to the amount so accrued ($4,000 in the example above). The amount credited to the dealer reserve was not taken into income at the time of the sale of the contract. The contracts with four of the financial institutions provided for payments to John from reserve accounts when the cash balances of such accounts exceeded *228 a certain percentage of the total unpaid balance on contracts outstanding. The contract with the fifth institution provided for payments from the reserve account only after all contracts had been paid or settled in full. The contracts with the financial institutions varied with respect to John's liability where customers failed to pay amounts due. In some cases John was required to repurchase the contracts for the amount remaining due. In other cases if the financial institution repossessed the merchandise within a specified period John was required either to repurchase it for the amount due under the contract or to compensate the financial institution for any loss it might incur on repossession and sale by it. In the event John was unable to make such repurchases or compensate for such losses by payment in cash the financial institution was given the right to draw upon the cash balance in his reserve account. During the years in issue California law required a reduction in the finance charge in the event a customer prepaid the balance due. In the event of such prepayment the financial institution debited the dealer reserve account by a proportionate part of the refund credit to *229 which the customer was entitled. The net increases in dealer reserve accounts were as follows: 1958
$ 9,093.03
1959
48,974.52
1960
18,280.34
The respondent determined deficiencies in both cases by increasing the taxable income of the business by the net increase in dealer reserve accounts during each of the years in issue. The net increase in 1958 was taken into account in the proposed adjustments for 1959 pursuant to section 481. [1]
John and Dixie Fowler were married in 1957. They separated March 9, 1960. John and Dixie entered into a property settlement agreement on December 2, 1960. An interlocutory decree of divorce was entered on December 22, 1961. John and Dixie were domiciliaries of California during the years in issue. John treated income from the trailer business in 1959 as though it were composed of a 12 percent return on his separate property, plus income attributable to the personal efforts of himself and Dixie. He reported all of the income attributed to the 12 percent return on his separate property and one-half of the remainder on the theory *230 that such remainder was community property, taxable one-half to himself and one-half to Dixie. John treated all the income from the trailer business in 1960 as his separate property. The respondent determined in John's case that the income from the business in both 1959 and 1960 was his separate property, except for $8,000 which was assigned in each year as the amount of the income from the business attributable to John's services and taxable as community property, one-half to John and one-half to his wife. Dixie did not report any of the income from the business on her returns for 1959 and 1960, apparently on the theory that such income was entirely the separate property of John. She reported wages from the business in 1959 in the amount of $947.95. In Dixie's case the respondent determined that all income from the business in 1959 and through March 9, 1960 [2] was community property and therefore taxable one-half to her. *231 Having made these inconsistent determinations respondent introduced no evidence at trial, relying on John and Dixie to develop the facts. Opinion Dealer Reserve Issue Respondent's position is that the income of the trailer business included amounts credited to dealer reserve accounts at the time customers contracts were sold to financial institutions. The cases support that position. Commissioner v. Hansen, 360 U.S. 446 (1959); Wiley v. Commissioner, 266 F. 2d 48 (C.A. 6, 1959), certiorari denied 361 U.S. 831 (1959), affirming a Memorandum Opinion of this Court; Morgan v. Commissioner, 277 F. 2d 152 (C.A. 9, 1960), affirming 29 T.C. 63 (1957); General Gas Corporation v. Commissioner, 293 F. 2d 35 (C.A. 5, 1961), affirming 33 T.C. 303 (1959); Shapiro v. Commissioner, 295 F. 2d 306 (C.A. 9, 1961), certiorari denied 369 U.S. 829 (1962), affirming a Memorandum Opinion of this Court; Shoemaker-Nash, Inc., 41 B.T.A. 417 (1940). Dixie introduced no evidence and made no argument on brief with respect to the dealer reserve issue. John seeks to distinguish *232 the instant case from those cited on three principal grounds. First, he argues that the sale of a trailer and the sale of a conditional sales contract are separate transactions. Conceding that he was on an accrual basis with respect to sales of trailers, he contends that he is nevertheless entitled to be on the cash basis with respect to the sale of contracts. John supports this position by pointing out that the 1954 Code and regulations thereunder authorize the use of certain hybrid accounting systems. See section 446(c)(4) and section 1.446-1(c)(1)(iv)(a), Income Tax Regs.
The problem with this argument, in our view, is that the provisions cited do not authorize the sort of hybrid method John employed. The regulations state: Sec. 1-446-1 General rule for methods of accounting. (c) Permissible methods. - (1) In general. Subject to the provisions of paragraphs (a) and (b) of this section, a taxpayer may compute his taxable income under any of the following methods of accounting: * * *
(iv) Combinations of the foregoing methods. (a) In accordance with the following rules, any combination of the foregoing methods of accounting will be permitted *233 in connection with a trade or business if such combination clearly reflects income and is consistently used. Where a combination of methods of accounting includes any special methods, such as those referred to in subdivision (iii) of this subparagraph, the taxpayer must comply with the requirements relating to such special methods. A taxpayer using an accrual method of accounting with respect to purchases and sales may use the cash method in computing all other items of income and expense. However, a taxpayer who uses the cash method of accounting in computing gross income from his trade or business shall use the cash method in computing expenses of such trade or business. Similarly, a taxpayer who uses an accrual method of accounting in computing business expenses shall use an accrual method in computing items affecting gross income from his trade or business. The reports of both Congressional committees contain the following discussion of section 446(c): In subsection (c) [of section 446] the permissible methods of accounting subject to the provisions of subsections (a) and (b) are enumerated. All methods of accounting recognized under existing law are continued. In addition *234 one or more hybrid methods may be authorized in the regulations issued under paragraph (4). One such method, in the case of a small retail store, will be an accrual of items affecting gross income such as purchases, sales of goods, accounts payable, and accounts receivable. In such a case items of deduction such as rent, interest, clerks' salaries, insurance and similar items may be accounted for on a cash basis. Any such hybrid method is, of course, subject to the requirements of subsection (b) that there be a clear reflection of income under the method. The example used suggests doubt that Congress intended that a taxpayer who reported purchases and sales on the accrual basis should be permitted to report sales of customer paper on the cash basis. To make the result depend upon a factual determination as to whether there was a single "three-cornered" transaction or two separate transactions would seem a complexity to be avoided in the absence of a clear legislative mandate to the contrary. The permission to use a combination of accounting methods is explicitly made subject to the qualification that the combined method clearly reflect income. The accounting method used by John *235 does not differ in any material respect from that used by taxpayers in the cases cited. In those cases the courts upheld the Commissioner's determination that the taxpayers' accounting methods did not clearly reflect income. The cases cited support the conclusion that whatever may be the extent of the permission to use hybrid methods it does not go so far as to authorize the method here employed. Second, John argues that the respondent's position is inconsistent with the decisions of this Court in Gunderson Bros. Engineering Corp., 42 T.C. 419 (1964) and Luhring Motor Co., 42 T.C. 732 (1964). These cases involve accrual basis dealers who retained their customers' paper. We held that the dealers were entitled to take finance charges into income as they were earned over the life of the contract. In so doing, however, we explicitly distinguished cases where dealers sold their customers' paper to financial institutions and recognized that upon such a sale an amount credited to a reserve account must be accrued even though such amount represents a portion of the finance charge. This distinction is based on the fact that when the paper is sold the financial institution *236 recognizes a liability to the dealer for the amount credited to the reserve. All events have occurred to fix the right to receive that amount. It must therefore be accrued. That the finance charge is earned over the life of the contract does not seem to us to be inconsistent with the view that the amount credited to the dealer reserve is earned at the time the contract is sold. The Court of Appeals in General Gas Corporation v. Commissioner, supra, appears to have rested its decision to some extent upon the fact that the dealer there indorsed customer notes to finance companies "without recourse." The effect of such indorsement was to relieve the dealer of any liability on the instruments themselves. In the instant case John, in effect, guaranteed payment of the full amount due. His ultimate liability was not limited to amounts withheld in the dealer reserves. The transactions with the financial institutions would apparently be termed sales "with full recourse" by those associated with dealings in commercial paper. Cf. section 9-502, Uniform Commercial Code, and official comment. The cases cited at the outset, with the exception of General Gas Corporation v. Commissioner, supra, *237 involved, in part at least, arrangements similar to those involved in the instant case. The results reached in those cases strengthen us in our view that whether a sale of customer contracts is with full recourse or with recourse limited only to amounts withheld in the dealer reserve should not be determinative of the issue raised. In either sort of transaction, the purchaser of customer contracts recognizes a liability to the seller for amounts credited to the dealer reserve, subject to reduction only upon the possible occurrence of future events. The proper manner of accounting for such contingencies is through the establishment of offsetting reserves where permitted by law or through the charging off of actual losses as they occur in later years. Finally, John argues that the Supreme Court in Hansen held that the dealers there had a fixed right to receive amounts credited to dealer reserve accounts because only two things could happen to the cash balances of such accounts; they could be paid over to the dealer or drawn upon to satisfy obligations of the dealers to the financial institutions. Here, John points out, the amount credited to the dealer reserve was subject to reduction *238 to reflect the abatement of finance charges required upon prepayment. This strikes us as a distinction without a difference. That the amount credited to the reserve was subject to diminution in the event of prepayment by customers seems to us a similar contingency to the general risk of uncollectibility. In our view it is not a sufficient contingency to render the right to receive the full amount so improbable as to preclude accrual. See, accord, Wiley, supra; Morgan, supra; Shapiro, supra. Alternatively, John argues that if the respondent's determination is upheld he is entitled to deductions for reasonable additions to a reserve for bad debts equal to the face amount of the reserve accounts at the end of the years in issue. John was not on the reserve method for bad debts (but made specific charge-offs) for the years in issue. He is therefore not entitled to the benefits of the new section 166(g)(1)(A) enacted by P.L. 89-722, 89th Cong., 2d Sess., 80 Stat. 1151 (November 2, 1966). Section 166(g)(2) was made applicable to the years in issue by section 2(c) of P.L. 89-722. It provides that a reserve method for bad debts is to be in lieu of *239 any deduction for current charge-offs under section 166(a) which John did employ. We must, therefore, reject John's claim to deductions for additions to a reserve for bad debts. Respondent's determination on the dealer reserve issue must be upheld. Community Properly Issue The California Civil Code provided during the years in issue: Sec. 162. Separate property; wife SEPARATE PROPERTY OF THE WIFE. All property of the wife, owned by her before marriage, and that acquired afterwards by gift, bequest, devise or descent, with the rents, issues, and profits thereof is her separate property. The wife may, without consent of her husband, convey her separate property. Sec. 163. Separate property; husband SEPARATE PROPERTY OF THE HUSBAND. All property owned by the husband before marriage, and that acquired afterwards by gift, bequest, devise, or descent, with the rents, issues, and profits thereof, is his separate property. Sec. 164. Community property; presumptions as to property acquired by wife; limitations of actions. All other property acquired after marriage by either husband or wife, or both * * * is community property. The evidence establishes that the initial investment *240 in the trailer business consisted entirely of the separate property of John. Income attributable to a return on such investment was his separate property under California law and was therefore taxable to him alone. Under the law of California during the years in issue where a wife or husband conducted a business comprised of the separate property of either or both of them, the portion of income derived from such business which was attributable to the personal activity, ability and capacity of either spouse was community property. Pereira v. Pereira, 156 Cal. 1, 103 Pac. 488 (1909). Such income would be taxable one-half to John and one-half to Dixie. Poe v. Seaborn, 282 U.S. 101 (1930). John argues that 12 percent of the income from the business was attributable to invested capital and the rest to the services of himself and Dixie. Dixie apparently argues that under the law of California a husband and wife may determine the status of their property by agreement and there was an agreement between John and Dixie, entered into at the time the business was started and effective throughout the years in issue, that the income from the business was to be the *241 separate property of John. This alleged agreement, Dixie argues, is effective to make the income from the business taxable to John in its entirety. Taking Dixie's argument first, we are convinced by the evidence of record that there was no agreement of the sort alleged. Dixie introduced the property settlement as evidence of such an agreement. In it Dixie acknowledged that all assets of the business, including trade name, goodwill, leases, accounts receivable, reserve accounts and bank accounts, "are, and have been, the separate property of the husband." The property settlement was "approved" in the interlocutory decree of divorce. Thus, Dixie argues, the issue of whether the agreement existed as alleged is "res judicata" between the parties. The quoted language from the property settlement is relevant on the issue of the existence of an agreement, but we do not feel that any state court determination as to the existence of such an agreement as she argues for can be implied from the approval of the property settlement in the interlocutory decree of divorce. The divorce was granted after default on grounds of "extreme cruelty." The most that can be implied from the approval of the *242 property settlement in the decree of divorce is that the divorce court determined that the settlement assigned community property, ascertained as of the date of the settlement, between the parties in such proportions as it deemed just. Section 146, California Civil Code. We therefore do not reach the question what the effect in this proceeding would be if the divorce court had determined that there had been an agreement of the sort alleged. Cf. Commissioner v. Estate of Bosch, 363 F. 2d 1009 (C.A. 2, 1966), affirming 43 T.C. 120 (1964); Estate of Harry Britenstool, 46 T.C. 711 (1966). In fact, the terms of the property settlement itself suggest that the parties recognized that Dixie was entitled to one-half on the income from the business for 1959 attributable to the personal efforts of John and herself. Such recognition is inconsistent with the existence of an agreement of the sort alleged. Even if there had been such an agreement it would not have been effective, for Federal tax purposes, to the extent that it sought to shift income earned by one spouse to the other. Lucas v. Earl, 281 U.S. 111 (1930). Though it is not clear *243 from Dixie's brief, she may be making the argument that the alleged agreement between John and herself should be given effect for Federal tax purposes because the income from the business was, in fact, earned by John. Cf. G.C.M. 18884, 1937-2 C.B. 58. She seeks to suggest that her role in the business was that of a minor employee and that her contribution to the success of the business was fully reflected in the small salary she was paid and reported as income. If this is the argument being made, it must fail. The evidence of record is overwhelming that the success of the business was due to the substantial efforts of both John and Dixie, and there is a continuing undercurrent of suggestion that Dixie was herself the real driving force behind the operation. A disclaimer by her at this late time of all credit for the success of the business contrasts so glaringly with the weight of the evidence that it must be regarded as incredible. Turning to John's argument, its basic premise seems clearly correct, namely that an apportionment of the income from the business is required for Federal tax purposes in accordance with the law of California. Clara B. Parker, Executrix, 31 B.T.A. 644 (1934); *244 Ashley Manning, 8 T.C. 537 (1947). The principal difficulty is in deciding the proper method of making such an apportionment. See generally Saul, "Apportionment Of Income From A Spouse's Separately Owned Property," 51 Cal. L. Rev. 161 (1963). The deficiency notice in John's case seems to be based upon the apportionment method followed in Van Camp v. Van Camp, 53 Cal. App. 17, 199 Pac. 885 (1921). The deficiency notice in Dixie's case seems to reflect a reliance upon the presumption of California law that all property acquired by either spouse during marriage is community property. See, e.g., In re Brenneman's Estate, 157 Cal. App. 2d 474, 321 P. 2d 86 (1958). We are convinced that faced with the facts of the instant case a California court during the years in issue would have applied the method used in Pereira v. Pereira, supra.Cf. In Re Neilson's Estate, 57 Cal. 2d 733, 22 Cal. Rptr. 1, 371 P. 2d 745 (1962). The evidence clearly established that capital was not a significant income-producing factor in the business. The most important factors were clearly the personal efforts of Dixie and John. In such *245 situations this Court has repeatedly held that the apportionment method of Pereira is applicable. Estate of Clarence B. Eaton, 10 T.C. 869, 882, et seq. (1948) and cases cited therein. Pereira involved an action by a wife against her husband for divorce wherein it became necessary to determine what portion of the income from the husband's cigar store and saloon was community property. The lower court held that all the income was community property. The Supreme Court of California reversed, stating, at 156 Cal. 7, 103 Pac. 491: In the absence of circumstances showing a different result, it is to be presumed that some of the profits were justly due to the capital invested. There is nothing to show that all of it was due to defendant's efforts alone. The probable contribution of the capital to the income should have been determined from all the circumstances of the case, and as the business was profitable, it would amount at least to the usual interest on a long investment well secured. * * * In support of the 12 percent return he allowed for, John made reference to the interest yield on funds loaned to him in connection with his business. If there was *246 any error in the use of that figure it was in favor of the respondent and Dixie. We therefore find that 12 percent of the income from the business was attributable to a return on capital and the remainder to the services of John and Dixie. Accepting for this purpose respondent's determination on the dealer reserve issue, John proved by uncontradicted evidence that the amount of his separate property invested in the business in 1958 was $19,048. He also proved that the amounts of business income attributable to return on capital and to services in 1958, 1959 and 1960 are as shown in the following table: ANALYSIS OF CAPITAL INCLUDING DEALERS RESERVES
SUMMARY OF ASSETS AND LIABILITIES:
January 1, 1959
January 1, 1960
Cash
$ 1,463
$ 5,479
Receivables
3,465
13,598
Inventories
54,172
223,701
Property and equipment
3,929
62,183
Dealers reserves
9,093
58,068
Other assets
1,539
Total
$72,122
$364,568
Less liabilities
$45,961
$266,591
NET CAPITAL
$26,161
$ 97,977
ANALYSIS OF CAPITAL GIVING EFFECT TO A 12% RETURN ON CAPITAL: 1958
1959
1960
John E.
Dixie
John E.
Dixie
John E.
Dixie
Fowler
Fowler
Fowler
Fowler
Fowler
Fowler
Balance at Jan. 1
$23,176
$ 2,985
$60,295
$37,682
Invested July 1, 1958
19,048
Total
$19,048
$23,176
$ 2,985
$60,295
$37,682
Income for the year: Return on capital, 12%
1,143
2,781
358
7,235
4,522
Other income including dealers
reserves
4,140
4,140
37,997
37,997
6,787
6,788
Total Income
5,283
4,140
40,778
38,355
14,022
11,310
Total
$24,331
$4,140
$63,954
$41,340
$74,317
$48,992
Less withdrawals
1,155
1,155
3,659
3,658
14,823
14,823
Balance at Dec. 31
$23,176
$2,985
$60,295
$37,682
$59,494
$34,169
*247 All withdrawals were properly charged in the above computations to community income. Van Camp v. Van Camp, supra; Todd v. Commissioner, 153 F. 2d 553, 555 (C.A. 9, 1945); Ashley Manning, supra. It should be noted that income attributed in the above computations to a return on Dixie's portion of the community income left in the business is community property. Todd v. Commissioner, supra; Ashley Manning, supra. As noted earlier, the deficiency for 1960 in Dixie's case was based on the assumption that the cut-off date for treating business income as community property should be March 9, 1960, the date that John and Dixie separated, and we ruled that the respondent was precluded from asserting a larger deficiency in that case based on a contrary assumption. The deficiency notice in John's case was apparently based on the assumption that the proper cut-off date for treating business income as community property was the date of the separation agreement, December 2, 1960, and respondent has not sought to increase the asserted deficiency against John by the use of any other date. Use of the March 9, 1960, cut-off date in *248 John's case when combined with his allocation of income from the business between capital and services would produce a larger deficiency than that determined against him. We think that the same cut-off date should be used in both cases, subject to the condition that the use of such date shall not be permitted to result in the assessment of a deficiency in either case larger than that asserted in the statutory notices on account of inclusion of dealer reserves and allocation of business income between separate and community property. See references cited in footnote 2, supra. The separation of the parties did not terminate the community as a matter of law, cf. Brown v. Brown, 170 Cal. 1, 147 Pac. 1168 (1915), and there is no evidence to suggest that John and Dixie made any agreement at that time relative to the status of income from the trailer business. However, the property settlement agreement, executed December 2, 1960, provided that: Wife does hereby acknowledge that she has no interest in the following items which are, and have been, the separate property of the husband: 1. All assets of "ENGLISH JOHN TRAILER SALES," wheresoever situated, including trade *249 name, goodwill, leases, accounts receivable, reserve accounts, and bank accounts * * * No part of the earnings of the business after December 2, 1960, was attributable to the efforts of Dixie. Therefore, we think the above-quoted language constitutes an agreement valid under California law and effective for Federal income tax purposes to transform the business and the income therefrom into the separate property of John as of December 2, 1960. Van Every v. Commissioner, 108 F. 2d 650 (C.A. 9, 1940), certiorari denied 309 U.S. 689 (1940). We therefore hold that the proper cut-off date for treating business income as community property (subject to the condition noted above) is December 2, 1960. Decisions will be entered under Rule 50. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise noted.↩
2. The March 9, 1960, cut-off date was given effect by multiplying the total adjusted income of the business by a fraction, the numerator of which was 68, the number of days in the year prior to separation, and the denominator of which was 365, the total number of days in the year. At trial respondent moved to increase the deficiency against Dixie on the theory that the cut-off date for treating business income as community property should have been placed at December 2, 1960, the date of the property settlement, rather than at March 9, 1960, the date of separation. The motion was denied, and respondent has not objected to that ruling on brief. Cf. Commissioner v. Long's Estate, 304 F. 2d 136↩ (C.A. 9, 1962).