**GENERAL GAS CORPORATION,**
Petitioner,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 18365.**

United States Court of Appeals
Fifth Circuit.

Aug. 11, 1961.

Rehearing Denied Oct. 2, 1961.

**36**

Paul O. H. Pigman of Stone, Pigman & Benjamin, New Orleans, La., and Charles W. Wilson, Harvey H. Posner, Watson, Blanche, Wilson, Posner & Thibault, and E. Leland Richardson, Dale, Richardson & Dale, Baton Rouge, La., of counsel, for petitioner.

Meyer Rothwacks, Carolyn R. Just, Lee A. Jackson, Dept. of Justice, Washington, D. C., Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Hart H. Spiegel, Chief Counsel, John M. Morawski, Atty., Internal Revenue Service, Washington, D. C., for respondent.

Before JONES and BROWN, Circuit Judges, and DE VANE, District Judge.

### JOHN R. BROWN, Circuit Judge.

This appeal from the Tax Court involves two questions. The first is whether this accrual basis Taxpayer, a corporation, must include in its taxable income amounts held to its credit in a "Dealer's Reserve Account" by a finance company which had purchased its customer notes during the year in which the finance company credits it to the dealer-Taxpayer. If that inquiry is answered affirmatively, the second issue must be resolved. Should the portions of the reserve which constitute finance charges imposed by the Taxpayer on its customers and included in the face of the notes be given any different treatment? More specifically, the question is whether reserves made up of finance charges are to be taken into income at the time the credit is entered by the finance company or pro rata during the life of the installment note as monthly collections are

made. The Tax Court answered both of these questions favorably to the Commissioner. 33 T.C. 303. Prime reliance was placed on Commissioner of Internal Revenue v. Hansen, 1959, 360 U.S. 446, 79 S.Ct. 1270, 3 L.Ed.2d 1360, recently decided by the Supreme Court, which was a decision on three appeals all involving factual situations similar in most respects to the one now before us. We agree with the Tax Court's determination of both questions.

The somewhat involved facts, most of which are formally stipulated by the parties, may be briefly summarized. The Taxpayer, General Gas Corporation, is a distributor of liquefied petroleum gas and also sells tanks and other equipment required in the storage and use of gas. Its customers include both industrial and home users. To increase the home-use market for its gas, the corporation in 1949 expanded its activities to include sales of household gas appliances. The corporation found that to be competitive in this field it was necessary that installment credit purchases of these items be readily available to its potential customers. Consequently, an installment-time-payment plan was established. A customer desiring to make an installment credit purchase was required to make a down payment of cash or acceptable trade-in. In addition he would execute a note in the amount of the unpaid portion of the selling price plus finance charges which General Gas charged for an installment-time-sale. A chattel mortgage, conditional sales contract or the like was utilized to secure the note. The customer obligated himself to pay off the note in installments over a period of 12 to 36 months.

Originally General Gas did not refinance its credit sales but merely held the notes until maturity. Shortly, though, a more liquid position was necessary and several long-term loan arrangements were entered into, as well as a short-term arrangement whereby customer notes were endorsed with recourse as collateral. Only a little over a year passed before more cash was needed. It

was then determined that due to the demands of its long-term loan sources and a desire to place some of its capital stock on the open market a new note financing plan would have to be worked out. This precipitated the financing arrangement here under scrutiny.

Early in 1952, the tax year here in question, General Gas entered into contracts with three different financing agencies, Bancredit, Guaranty and ReDisCo,[1] providing for the sale to them of all acceptable customer notes to be endorsed without recourse. The Bancredit contract, identical to the Guaranty contract, provided that the notes were to be endorsed to Bancredit in exchange for payment to General Gas of the "net cash selling price" [2] of the appliance less 10%. The agreement also provided that the aggregate of this 10% and the finance charges (which made up the balance of the face of the note) was to be set up as a reserve account on Bancredit's books. Customer payments were to be made directly to General Gas for immediate daily transmission to Bancredit. While the reserve was maintained to the credit of General Gas and was subject to specified charges against it arising under the financing agreement payments by Bancredit from the account to General Gas were to be made only when the reserve exceeded 30% of the balance of all out-

standing notes.[3] On termination of the arrangement, the entire balance was to be remitted. Unlike many refinancing arrangements, the profit of Bancredit was not to come from the finance charges built into the customers' time-purchase notes. Under the "Reserve" set-up of this arrangement, finance charges were for General Gas. For credit extended by it, Bancredit was to receive simple 7% interest on the balance of its investment in the notes.

The contract with ReDisCo was identical in every respect except that there was to be no deduction of a 10% discount. On the transfer of the note ReDisCo was to pay General Gas the entire "net cash selling price" of the note without discount. Consequently, under this agreement only the portion of a note representing finance charges went into the Reserve Account.[4]

The primary position advanced by General Gas here and below is that no part of the Dealer Reserve Account is includible in its taxable income so long as it stands as a mere credit on the books of the finance company. Rather, it contends, the amounts are taxable only when actually received in some form. This position on Dealer Reserve Accounts has, of course, been advanced in numerous cases and has been based on many varying theories.[5]

---

1. First Bancredit Corporation of St. Paul, Minnesota; Guaranty Bank & Trust Company of Lafayette, Louisiana; Refrigeration Discount Corporation of Detroit, Michigan.

2. The "net cash selling price" was defined in the contracts to be the "cash selling price of the merchandise financed without the addition of any finance charge, less any trade-in allowance or discount for cash, and less any down payment." In other words it was the unpaid portion of the sales price of the item purchased not including finance charges.

3. The Reserve Account was not to be reduced below $10,000.

4. It was stipulated that this more favorable arrangement was made possible because it related only to the appliances sold by General Gas which were manufactured by an affiliate of ReDisCo.

5. Schaeffer v. Commissioner, 6 Cir., 1958, 258 F.2d 861; Baird v. Commissioner, 7 Cir., 1958, 256 F.2d 918, affirmed Commissioner of Internal Revenue v. Hansen, 1959, 360 U.S. 446, 79 S.Ct. 1270, 3 L. Ed.2d 1360; Texas Trailercoach v. Commissioner, 5 Cir., 1958, 251 F.2d 395; West Pontiac v. Commissioner, 5 Cir., 1958, 257 F.2d 810; Morgan v. Commissioner, 9 Cir., 1960, 277 F.2d 152; Wiley v. Commissioner, 6 Cir., 1959, 266 F.2d 48; United States v. Hine Pontiac, 58–2 USTC Par. 9841, reversed 360 U.S. 715, 79 S.Ct. 1443, 3 L.Ed.2d 1539; Shapiro v. Commissioner, 1959 P–H, T.C.Memo. Dec., par. 59,151 (July 24, 1959) (pending on appeal to the 9th Circuit); Cadjew v. Commissioner, 1959 P–H, T.C.Memo. Dec., par. 59,148 (July 20, 1959); Shoemaker-Nash v. Commissioner, 41 B.T.A. 417.

It facilitates discussion of both questions to reduce this to the example used in the record of a typical credit sale by General Gas with the contemporaneous financing. An appliance is sold to a customer on which $400 remains due after the down payment. The finance charge is $100. Therefore the customer executes a note for $500 payable in 24 monthly fixed installments. General Gas sells the note to Bancredit and receives a payment of $360 (being the net cash selling price less the 10% discount). This discount of $40 and the $100 finance charge are credited to the Reserve Account on Bancredit's books.[6]

The theory most commonly urged has been that the so-called reserves (Items (d) and (f), note 6, supra) have not presently been received, their immediate payment may not be demanded, and, of most importance, due to the contingencies existing in these situations may never be received. Whatever may have been the conflict among the Circuit Courts on this question, the authoritative word of the Supreme Court in Commissioner of Internal Revenue v. Hansen has laid to rest most of the uncertainties. That decision required the taxpayers involved to include reserves similar at least to Item (d) in their taxable income for the year in which credits were made on the finance company's books. The basis of the Court's holding was that "it is the time of [the] acquisition of the *fixed right to receive* the reserves and not the time of their *actual* receipt that determines whether or not the reserves have accrued and are taxable." 360 U.S. 446, at page 464, 79 S.Ct. 1270, at page 1280.

We conclude that the Hansen case is in point and controlling as to the first issue raised by the Taxpayer. General Gas has attempted to distinguish the present situation on the facts by pointing out that the notes here involved were sold "without recourse," while those in Hansen were endorsed "with recourse." This distinction is not significant. While it is true that General Gas had no direct personal liability, the Reserve Account (Items (d) and (f)) was liable for all customer defaults, losses from repossessions, payment of Bancredit's 7% interest charge and all other liabilities of General Gas under the financing contract. Consequently General Gas receives full financial benefit from the entire amount of these reserve credits. It receives in cash the cumulative reserve in excess of the 30% limit and, of course, will eventually receive the entire amount remaining to its credit. To the extent that charges are made against the reserve for note defaults and the like, they constitute offsets against, and hence payment of, liabilities of General Gas under the financing agreement. Therefore the entire amounts contained in the reserves will be received in full, either by reduction in liabilities or by cash payment. The fact that the financing agreements in effect put a ceiling on General Gas'

6. This is plainer in tabular form.

### Between Dealer and Customer

| Item | | | |
|------|-----------------------|------|------|
| (s) | Net cash selling price | | $400 |
| (f) | Finance charges | | 100 |
| (n) | Face amount of note | | $500 |

### Between Dealer and Bancredit

| | | | | |
|------|----------------------------------------|------|------|------|
| (p) | Amount to be paid to General Gas (Item (n)) | | | $500 |
| | Paid by: | | | |
| (c) | Cash | | $360 | |
| | Reserves | | | |
| (d) | 10% discount | $ 40 | | |
| (f) | Finance charges | 100 | 140 | $500 |

economic liability did not alter in the slightest the full beneficial receipt of these sums by General Gas. Moreover, on the Hansen concept this was certain and known at the moment the credit was entered. Thus the language of Hansen, quoting from the Seventh Circuit, is equally applicable here. "Ultimately only two things could happen to the funds in the dealer's reserve accounts: either the amounts would be paid to the [dealer] in cash or they would be used to satisfy the [dealer's] other obligations to the finance companies." 360 U.S. 446, at page 466, 79 S.Ct. 1270, at page 1281, 3 L.Ed.2d 1360.

■ This brings us to the second problem concerning the inclusion in income of Item (f) which is the portion of the reserves representing finance charges. As pointed out these charges are included in the face amount of the notes. Taxpayer insists that even though it fails on the basic issue finance charges should be taken into income ratably as collectible, and collected, over the life of the note.

The basic positions of the parties may be briefly stated. General Gas argues that the $100 finance charge (Item (f)) is imposed by it for the extension of credit, that is for interest, insurance and administrative expense of handling the installment-time-sale. The amount is not fully earned at the time the notes are received from the customer. Nor is the situation altered any by the inclusion of these amounts in reserve accounts since these finance charges will be received only when and if payments are actually made by the customer. Consequently, they should not be included in income until actually earned or actually received.

The Commissioner takes the position that the entire $140 (Items (d) and (f)) is taxable when credited to the Reserve Account. This is true, he argues, despite the fact that the entire $100 finance charge may not have been fully earned by General Gas at the time of the sale of the note since here, as in Hansen, General Gas was credited immediately with the full amount of it and, as in the case of the 10% discount (Item (d)), it acquired a known fixed right to receive this either in cash or offsets to liabilities or both. He continues that the finance charge is part of the total consideration for the note sale and thus the gain on that charge should be accrued when the sale occurs.

The Hansen decision involved three different appeals, each concerning taxpayers making credit sales to their customers in much the same manner as did General Gas. Each customer desiring to make a credit purchase was required to execute a note which was to be paid off in installments. The note equaled the sum of the unpaid balance of the purchase price (e. g., $400, Item (s)) plus finance charge ($100, Item (f)). To finance these purchases, the taxpayer would sell the note to a finance company for the "agreed price," apparently something less than the face amount of the note. The finance company would remit a major percentage of this purchase price to the taxpayer crediting the balance to a Dealer Reserve Account. Provisions were made in each case for payments to the taxpayer from the Reserve Account when it exceeded a specified percentage of the unpaid balance of the notes. As pointed out the Court held these reserves to be includible in income at the time of the credit since there was then a fixed right to receive them.

The Court then turned to the specific problem of finance charges included in the face of the notes. To the contention that portions of the Reserve Accounts "consist of * * * percentages of 'finance charges,' not being a part of the purchase price of the installment paper," and that they therefore "should in no event be regarded as accrued income to the dealers," the Court replied that the taxpayers had "wholly failed to adduce evidence [in] support [of] their claims." 360 U.S. 446, at page 468, 79 S.Ct. 1270, at page 1282. Specifically the Court pointed out that they made no showing that any percentages of the finance charges were even credited to the Re-

serve Accounts and, if they were, that they were identified and separated "from the percentages of the purchase price of the installment paper that were retained by the finance companies * * *." 360 U.S. 446, at page 468, 79 S.Ct. 1270, at page 1282. The Court then concluded that "For these reasons the respective taxpayers have wholly failed to sustain the burden of showing that any part of the amounts credited on the books of the finance companies to the respective Dealers Reserve Accounts was entitled to special treatment." 360 U.S. 446, at page 469, 79 S.Ct. 1270, at page 1282.

We agree with Taxpayer that Hansen did not decide this specific issue as such. The Court merely concluded that facts were not adequately established to show any basis for difference in treatment. It did not, however, undertake to rule out the likelihood of such distinction on a proper showing. Likewise, we agree with Taxpayer that nothing can be read into the denial of certiorari in Wiley v. Commissioner, 6 Cir., 1959, 266 F.2d 48, certiorari denied 361 U.S. 831, 80 S.Ct. 80, 4 L.Ed.2d 73, since we are told often that this is of no significance.[7] But that is far from agreeing with Taxpayer that Hansen does not control. On the contrary, we think the principles announced there compel a like result on the facts of this case concerning Item (f).

Once we accept, as we must, the rationale of Hansen, there is nothing to distinguish the installment charges (Item (f)) from the 10% discount (Item (d)). Under the Hansen concept the immediate availability of the $40 (Item (d)) discount did not depend on either the actual receipt of that sum, or the time of its receipt, from the customer. No more so does the actual payment of the finance charges of Item (f) depend on them. Indeed, in the operation of this so-called

reserve plan the failure to collect the notes from which proceeds the net cash sales price (Item (s)) or the 10% discount (Item (d)) would be paid is virtually self-executing. As a defaulted item it would be charged against the reserve. This would, of course, mean that to this extent General Gas would not in the future recover any cash from that transaction. But at the same time the charge against the reserve to the extent of the loss from the default (not in excess of total reserves) would relieve General Gas of its obligation to make good.[8]

We do not think that the contention that these finance charges (Item (f)) are not "earned" is of any significance. As a matter of fact, as between the dealer and the customer, they appear to us to be earned, certainly as far as a legally enforceable obligation is concerned. At least this record is silent that any one of the thousands of customer installment purchase notes were ever paid in advance, or that any discount or rebate was, or would be due in such event. Availability of a time purchase sale—a facility which General Gas could offer—was what presumably made it possible for the customer to acquire the appliance. That "service" was fully performed at the moment a time purchase sale was effected. Certainly General Gas had no further obligations to the customer. So far as the relations between the dealer and the finance company were concerned, these were, as a contract liability, equally earned. While it is true that the financing contract required General Gas to service the accounts, make the collections, handle repossessions, etc., this was an obligation undertaken by General Gas and there is nothing to indicate that it was for these services so essential to its own economic welfare that the finance companies agreed to grant the discount

7. Brown v. Allen, 1953, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469; Atlantic Coast Line R. Co. v. Powe, 1931, 283 U.S. 401, 51 S.Ct. 498, 75 L.Ed. 1142; Flowers v. Travelers Ins. Co., 5 Cir., 1958, 258 F.2d 220.

8. Thus at the very instant one note is declared in default, the full reserve in a note just transferred is available to extinguish, to that extent, the liability of General Gas. Its utility in this respect does not depend on when it is due from, or actually paid by, the customer.

reserve of either one or both of Items (d) and (f). Perhaps one could look upon them as "unearned" in the sense that with respect to each monthly payment due from customers, some steps had to be taken in the way of collection and servicing of the accounts, the remittances to the finance company, and the like. But if these factors had any significant bearing on the amount of the so-called reserve whether for Item (f) alone or both Item (d) and (f) together, the record fails to show it.

We do not consider any more persuasive the argument by General Gas that since as to customer notes retained by it General Gas was permitted to defer the portion representing finance charges (the equivalent of Item (f)) over the life of the note, the same procedure should be allowed as to finance charges reserved in notes sold to Bancredit. This is based primarily on contentions made by the Government in the Hansen litigation somewhat to the effect that neither sound analysis nor consideration of the practical realities justifies the conclusion that the interposition of a finance company makes a change in the dealer's tax liability. It is not disputed that General Gas treated these finance charges under the declining balance method.[9]

The simple answer, of course, is that things were not the same. There was a vital distinction. As to those notes retained by General Gas it was an unlimited exposure of the corporation's direct credit to their full amount. It had no such exposure on those sold to the three financing companies. Indeed, it was the very necessity of escaping this accumulating direct corporate liability

through the repledging of customer notes which led to the making of these financing arrangements. Where formerly it had unlimited liability, its liability was now limited to an amount approximating 35%. On the other side of the ledger, it also had substantial advantages under the financing arrangement. Where, for notes held by General Gas, it got the benefit of the installment finance charges only when and as paid, under the financing arrangement at least two things occurred. First, there was an immediate credit constituting an unconditional liability upon the part of the financing company to pay the equivalent of the finance charges either in cash or offsets or both. Second, depending upon the state of the balance in the reserve fund and the current business being done, the addition of each new note and the reserves made up of Items (d) and (f) could produce distributable cash long in advance of the time the installments of such paper would be collectible or collected. These things were the direct consequence of a sale, not a mere pledge, of these customer notes to the financing companies. The note was sold. For it General Gas obtained cash (Item (c)) and valuable credits (Items (d) and (f)). It is the sale itself which makes a difference. It makes a difference here even though with respect to some phases of the Hansen problem the Government may have contended that the interposition of the finance company would work no change in a dealer's tax liability.

Hansen compels affirmance. If this is unsatisfactory, relief must now come from Congress.

Affirmed.

9. In May 1952 General Gas held a total of $1,681,067.87 in customers' notes which had formerly been pledged with a Chicago bank. In addition, during that year it acquired new customers' notes in

the sum of $378,926.64 on sales which did not qualify under any one of the three financing arrangements. At December 31, 1952 the total of these company-held notes was $1,099,648.07.