FEDERATED DEPARTMENT STORES, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 526–66.   Filed December 30, 1968.

*Robert A. Schulman* and *Lyman G. Friedman,* for the petitioner. *John J. Larkin,* for the respondent.

OPINION

TIETJENS, *Judge:* The Commissioner determined deficiencies in income tax for the taxable years ending February 2, 1963, and February 1, 1964, in the amounts of $302,761.83 and $1,940,544.91, respectively.

---

The only issues remaining for our decision are:

(1) Whether, at the time petitioner sold its accounts receivable to a bank, it must recognize as income, previously unrecognized service charges included in the sold accounts;

(2) If so, whether the recognition at the time of the sale constitutes a change of accounting method instituted by the Commissioner under section 481, I.R.C. 1954;[1] and

(3) Whether certain payments received by petitioner qualify as contributions to capital under section 118.

All of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference.

Petitioner Federated Department Stores, Inc., is a Delaware corporation. Since 1946, petitioner's principal office has been in Cincinnati, Ohio.

For each of the taxable years here involved, petitioner filed its income tax returns with the district director of internal revenue, Cincinnati, Ohio.

Prior to its fiscal year ended 1948, petitioner was solely a holding company and operated no stores directly, but did so through subsidiary corporations. During its fiscal years ended 1948 and 1949, petitioner acquired and thereafter operated directly as divisions of petitioner, Halliburtons (a department store in Oklahoma City, Okla.) and Milwaukee Boston Store (a large department store in Milwaukee, Wisc.).

During its fiscal year ended 1950, petitioner acquired and thereafter operated directly as divisions of petitioner the department store businesses formerly operated by its subsidiaries Abraham & Straus, Inc. (A & S), Bloomingdale Bros., Inc. (Bloomingdale's), William Filene's Sons Co. (Filene's), the F & R Lazarus & Co. (Lazarus), and Foley Bros. Dry Goods Co. (Foley's).

Prior to its fiscal year ended 1955 petitioner, for Federal income tax purposes, employed a fiscal year ended January 31. For all its fiscal years beginning in 1955, petitioner has employed an annual accounting period which varies from 52 to 53 weeks and ends on the Saturday nearest January 31 of each year. Prior to its fiscal year ended 1965, petitioner generally employed an accrual method of accounting.

## Deferred Service Charge Issue

In the regular course of its business, petitioner made sales at retail to customers which included sales on credit to be paid over a fixed

---

[1] Hereinafter, all statutory references are to the Internal Revenue Code of 1954 unless otherwise specified.

period of time (sometimes referred to as traditional installment sales). For the privilege of doing so, customers making these purchases on credit, at the time of the purchase, incurred a service or carrying charge (service charge) in addition to the regular sales price of the merchandise. The service charge was based upon the purchase price less the downpayment, if any, and the term over which the unpaid balance was to be paid. To account for this type of transaction on petitioner's books, the purchase price was credited to sales and debited to accounts receivable. If a downpayment were made, cash instead of accounts receivable would be debited in the amount of the payment. The service charge was debited to accounts receivable and credited to a deferred service charge account. Thus, in recording the entries, the service charge and the purchase price, less the downpayment, became one balance in the accounts receivable. For example, if the sales price of a refrigerator were $400 and the customer made a downpayment of $50, the service charge would be computed upon the unpaid balance of $350. Assuming a service charge of $25, the $375 would be payable ratably over the number of months specified in the contract.

Accounting for the sale, the $400 sales price would be credited to sales, the $50 downpayment debited to cash, and the $350 unpaid balance debited to accounts receivable. The $25 service charge reserve would be debited to accounts receivable and credited to the deferred service charge reserve account. As the customer made his monthly payment, a portion of the payment which represented the service charge would be credited to income. In the foregoing example, the amount that was recognized as income was determined by petitioner by dividing the $375 account receivable into the $25 service charge reserve account, yielding a percentage of 0.0667. The customer's payment, assuming a $30 payment, was subtracted from the $375 leaving a balance of $345. The petitioner would then apply the 0.0667 percent to the $345 and determine how much should be left in the deferred service charge reserve account. In this example, $23 would have remained in the deferred service charge reserve account and the difference between that amount and the $25, or $2, would have been credited to the service charge income account.

It was not practical to calculate individually each month the deferred service charge reserve for each 1 of about 200,000 customers having this type of installment account. An aggregate monthly calculation in conformity with the above example was used instead. Under it, the aggregate service charge on traditional installment sales made during the most recent 12 months was expressed as a percentage of total debits (including service charges) to these customers' accounts during the same period. This percentage was applied each month to total traditional installment balances outstanding at the end of the period to derive the amount of deferred service charges contained

therein. As of February 1, 1964 (the last day of petitioner's fiscal year ended 1964), the deferred service charge reserve account totaled $2,831,782.44.

As a matter of custom or State law, petitioner in previous years and in the years in issue abated an appropriate portion of the service charge on a traditional installment account when the account was paid in full prior to the expiration of the term called for in the particular purchase agreement. When a traditional installment account was paid within 90 days, the entire service charge was abated. When such an account was paid after 90 days but before the expiration of the term the service charge was abated on a sum-of-the-digits formula.

At the close of business on February 1, 1964 (the last day of its fiscal year ended 1964), petitioner sold to the First National Bank of Chicago (hereinafter sometimes referred to as FNB) all of its accounts receivable, except its 30-day accounts, for $155,295,052. Included in the $155,295,052 figure were deferred service charges of $2,831,782.44, which had not previously been recognized as income and, therefore, remained in the deferred service charge reserve account.

The purchase price of the accounts was cash in the amount of $136,624,527.75, which was equal to 90 percent of the face amount of the accounts less 2.037328-percent discount; the remaining 10 percent ($15,529,506) was held by FNB in a contract reserve. Upon collection of the accounts, the contract reserve would be reduced so as not to exceed 10 percent of the uncollected accounts or 2 percent of the accounts sold, whichever was greater.

The agreement between FNB and petitioner further provided that any abatement or reduction of service charges on account of prepayment would be considered as a collection of the account made by petitioner and that petitioner would be required to remit this amount to FNB.

Petitioner in recording (for book and tax return purposes) the sale of its accounts receivable, insofar as is here material, did as follows:

| | |
|---|---:|
| Reduced its accounts receivable by | $155, 295, 052. 00 |
| Set up a contract reserve of (10 percent contingency reserve retained by FNB) | 15, 529, 506. 00 |
| Deducted discount expense of | 3, 141, 018. 25 |
| Increased its cash by | 136, 624, 527. 75 |

As at February 1, 1964, petitioner computed its income from service charges in the same manner as if it had not sold its traditional installment accounts to the bank.

The question presented here is whether, at the time the receivables were sold, petitioner must recognize income with respect to the deferred service (financing) charges previously unrecognized for tax purposes but included in the traditional installment receivables sold to FNB.

The Commissioner believes this case is identical to *General Gas Corporation*, 33 T.C. 303 (1959), affd. 293 F.2d 35 (C.A. 5, 1961), certiorari denied 369 U.S. 816 (1962), and bases his arguments primarily on this case. In *General Gas*, the taxpayer sold to several finance companies chattel mortgages, conditional sales contracts, or the like. Included in the amounts of the notes sold were the unpaid portion of the purchase prices of household gas appliances sold to customers plus financing charges. The finance company remitted to General Gas the full face amount of the notes less an amount to cover interest on the sale of the notes and an amount representing a contingency reserve that was retained by the finance company but which would be returned to General Gas upon full payment of the notes.

Relying upon *Commissioner* v. *Hansen*, 360 U.S. 446 (1959), we held that General Gas must recognize as taxable income the full amount of the financing charges included in the notes sold and not previously recognized even though the payment for finance charges may have been retained by the finance companies in contingency reserves.

At odds with the Commissioner, the petitioner believes that the facts herein are distinguishable from *General Gas Corporation*, *supra*. This might be true. In *General Gas* and *Hansen*, the Court's decisions on this issue were based on the taxpayers' *failure to sustain their burden of proof* that the finance charges included in the notes did not belong to the taxpayers at the time the notes were sold and should have been accorded different treatment.

On the other hand, petitioner believes the question here is controlled by our holding in *Luhring Motor Co.*, 42 T.C. 733 (1964), and *Gunderson Bros. Engineering Corp.*, 42 T.C. 419 (1964). In *Luhring* and *Gunderson*, the taxpayers were on the accrual method. They sold merchandise and provided a time-payment procedure whereby the customer for a service charge could pay off his debt over a specified period of time.

The taxpayers retained the customer's obligations, recognizing at the time of the sale income in the amount of the sale, but deferred recognizing the service charges as income, choosing instead to recognize it ratably over the life of the debt.

Due to State law or business custom the customers could, by accelerating payments on the outstanding balance, receive a rebate for the unpaid finance charges for the unexpired term of the contract. We held that under these circumstances the taxpayers did not have to recognize the finance charges as income at the time the account arose due to sale of the merchandise, but only as their right to such charges became fixed and absolute.

Petitioner points to the following stipulation:

As a matter of custom or state law, petitioner in the past and in the years in issue abated an appropriate portion of the service charge on a traditional installment account if that account was paid in full prior to the expiration of the term called for in the particular purchase agreement. If a traditional account was paid within ninety days, the entire service charge was abated. If such an account was paid after ninety days but before the expiration of the term the service charge was abated on a sum of the digits formula.

Petitioner asserts it is clear that its right to receive finance charges was not fixed and absolute because a portion of the charge could be cut off in the event the purchaser prepaid his account and that these two cases control the question presented.

*Luhring* and *Gunderson Bros.* are not controlling on the facts herein because they only relate to the question of whether service charges are includable in gross income at the time they were charged to a customer's account, the time the account initially arose.

However, here the issue is whether, at the time the accounts were subsequently sold to FNB, petitioner must recognize as income these previously unrecognized service charges. We are aware that by the sales agreement with FNB, the bank retained 10 percent of the purchase price for the accounts as a contingency reserve; that the amount of the reserve retained by FNB was greater than the unrecognized service charges included in the accounts; that at the time of the sale to FNB, petitioner did not have an unfettered right to these unrecognized charges; and that petitioner alone bore the risk of any reduction in the service charges due to a prepayment of the account.[2] However, we have held that even under these circumstances petitioner must recognize the finance charges included in installment notes at the time they are sold. *Arthur V. Morgan*, 29 T.C. 63 (1957), affirmed per curiam 277 F.2d 152 (C.A. 9, 1960) ; *Wiley* v. *Commissioner*, 266 F.2d 48 (C.A. 6, 1959), affirming per curiam a Memorandum Opinion of this Court; *Shapiro* v. *Commissioner*, 295 F.2d 306 (C.A. 9, 1961), affirming a Memorandum Opinion of this Court. See also *Kravetz* v. *United States*, 204 F. Supp. 438 (D. N.J. 1962), and *Bruce-Flournoy Motor Corp.* v. *United States*, an unreported case (E.D. Va. 1962, 10 A.F.T.R. 2d 5473, 62–2 U.S.T.C. par. 9695). We think the aforementioned cases control the issue herein and we decide for the Commissioner.

### Change of Accounting Issue

Petitioner, after acquiring Milwaukee Boston Store in 1949, established a deferred service charge reserve account (similar to that described above) for that store's service charges on its traditional installment accounts and eliminated from its income for its fiscal year 1949 the amount of those service charges which had been included in Milwaukee Boston Store's income for prior years.

---

[2] Any reduction of service charges on account of prepayments was considered a collection on the account made by petitioner and it was required to remit this amount to FNB.

By 1951 each of petitioner's subsidiaries employed in their books the above-described method of accounting for service charges employing this method also in their income tax returns.

No request was made of the Commissioner by petitioner for use of said method and prior to the issuance of the statutory notice of deficiency covering the petitioner's fiscal year ended February 1, 1964, no adjustments were made by the Commissioner regarding petitioner's above-described method of accounting for service charges.

As of January 30, 1954, petitioner's reserve for deferred service charges consisted of the following amounts:

| Division | Amount | Division | Amount |
|---|---|---|---|
| A & S | $279,332 | Foley's | $310,610 |
| Filene's | 6,922 | Sanger's | 170,727 |
| Bloomingdale's | 29,400 | Fedway | 289,029 |
| Lazarus | 309,034 | Rike-Kummler | 95,484 |
| Shillito's | 199,852 | | |
| Milwaukee Boston Store | 50,800 | Total | 1,741,190 |

Of this $1,741,190, $1,380,462 was applicable to the accounts receivable involved in various transactions with banks during the period March 14, 1950, and January 31, 1964.

The above-described $1,741,190 is the portion of the adjustment attributable to pre-1954 Code years.

Between March 14, 1950, and January 31, 1964, petitioner on behalf of various of its divisions entered into transactions with banks involving all of the traditional installment accounts receivable and part of other accounts which each such division had at that time. These transactions were made pursuant to the agreements or extensions of agreements; the banks and their respective effective dates are listed below:

| Division | Bank | Date | Effective Date |
|---|---|---|---|
| A & S | National City Bank of New York | 3/14/50 | 2/26/50 to 2/26/55. |
| | | 5/ 4/54 | Extended to 5/2/59. |
| | | 10/20/58 | Extended to 5/1/64. |
| Milwaukee Boston | Marshall & Illsley Bank | 8/ 4/50 | 8/28/50 to 8/27/55. |
| | | 8/ 8/55 | Extended indefinitely. |
| Foley Bros | Second National Bank of Houston | 6/ 8/51 | 6/3/51 to 6/2/56. |
| | | 11/14/52 | Extended to 11/30/57. |
| | | 2/25/54 | Extended to 2/28/59. |
| | | 10/ 3/58 | Extended to 9/30/63. |
| Sanger Bros | First National Bank of Chicago | 4/24/52 | 5/3/52 to 5/2/57. |
| | | 4/10/57 | Extended to 5/2/62. |
| | | 1/ 2/62 | Extended to 5/2/67. |
| Fedway-Amarillo | First National Bank of Amarillo | 4/14/53 | 5/2/53 to 5/3/58. |
| Fedway-Corpus Christi | First National Bank of Chicago | 4/27/53 | 5/30/53 to 5/31/58. |
| Fedway-Longview | First National Bank of Chicago | 4/28/53 | 5/30/53 to 5/31/58. |
| Fedway-Wichita Falls | First National Bank of Chicago | 4/29/53 | 5/30/53 to 5/31/58. |
| Shillito's | First National Bank of Chicago | 6/ 2/53 | 7/4/53 to 7/5/58. |
| Fedway-Albuquerque | First National Bank in Albuquerque | 3/11/54 | 4/19/54 to 4/18/59. |
| Fedway-Bakersfield | First National Bank of Chicago | 3/11/54 | 6/16/54 to 6/15/59. |
| Bloomingdale's | Bankers Trust Co | 7/ 9/54 | 8/1/54 to 8/18/59. |
| | | 7/27/59 | Extended to 8/18/64. |
| Shillito's | Central Trust Co | 1/17/55 | 2/26/55 to 3/14/60. |
| | | 1/21/60 | Extended to 3/14/65. |
| F & R Lazarus | First National Bank of Chicago & Huntington National Bank. | 1/24/55 | 1/31/55 to 2/15/60. |
| | | 11/19/59 | Extended to 2/15/65. |
| Burdine's | First National Bank of Miami | 5/31/57 | 6/30/57 to 6/30/62. |
| Filene's | First National Bank of Boston | 12/12/60 | 12/30/60 to 12/31/65. |
| Rike's | Winters National Bank & Trust Co | 12/28/61 | 12/28/61 to 12/28/66. |

Except for minor variations which are immaterial to the issues here involved, each of the agreements with the various banks were substantially identical as to all material parts. The essential provisions of the agreements resulting in the transactions with the banks prior to the agreement with the First National Bank of Chicago dated January 30, 1964, were as follows:

(1) The transactions were of a continuing nature, covering approximately a 5-year term;

(2) The banks were committed to "purchase" all accounts offered by petitioner up to a maximum dollar amount and petitioner was obligated to pay one-fourth of 1 percent on so much of the dollar amount as was not used, computed by the excess of total accounts "sold" over the reserve;

(3) Repayment of the "sales price" was guaranteed by the contractual 10-percent reserve and also by the petitioner's equity in accounts previously transferred to the same bank and petitioner's accounts to be created in the future;

(4) If the contractual reserve fell below 10 percent of the amount due on the accounts, the bank would retain 20 percent of the accounts transferred to the banks in the future as a reserve. The provision for the retention of 20 percent by the banks in the future continued until such time as the reserve again reached 10 percent of the amounts due on the accounts;

(5) The petitioner was required to maintain a minimum reserve of 10 percent plus 100 percent of the amount of defaulted accounts. The petitioner's collections on accounts previously transferred to the bank were subject to the liability for the total repayment to the bank;

(6) The petitioner was to pay the prime interest rate plus one-half percent, monthly, on the exact amount which had not been repaid to the bank; and

(7) Any delinquent accounts either were charged against the contract reserve or petitioner at its option repurchased such accounts.

In accounting for the transactions with the banks described above, petitioner at the time of each such sale reduced the amount of its accounts receivable and increased the amount of its cash.

Each account assigned to the bank was stamped either "Sold to (Name of) Bank" or "Property of the (Name of) Bank."

The sales price of merchandise purchased by the petitioner's customers (exclusive of any service charge) reflected in the above-described sales to banks had been included in the petitioner's income at the time of the sale to the customer. And, as at the close of each fiscal year, petitioner continued to report income from the service charges on the accounts receivable "sold" to banks, under the same method as it had prior to those "sales" to the banks.

Petitioner continually "sold" new accounts to the banks and also acted as the banks' collection agent. Below is illustrated a typical settlement sheet showing the January 4, 1964, transaction of petitioner's Shillito's Division with the Central Trust Co., of Cincinnati, Ohio:

| Settlement sheet line No.— | New accounts transferred to bank by Shillito's | Collections and other items applicable to accounts previously transferred |
|---|---|---|
| 2 New contracts for month | $894, 967. 92 | |
| Less: 10 percent contract reserve | 89, 496. 79 | |
| | 805, 471. 13(A) | |
| 4 Payments by customers collected by Shillito's for the bank | $665, 221. 76 | |
| Less: 10 percent | 66, 522. 17 | |
| | | $598, 699. 59 |
| 5 Merchandise returned | 48, 634. 25 | |
| Less: 10 percent | 4, 863. 42 | |
| | | 43, 770. 83 |
| 7 Uncollectible accounts | 7, 556. 57 | |
| Less: 10 percent | 755. 66 | |
| | | 6, 800. 91 |
| Total | | 649, 271. 33 |
| 15 Defaults | 4, 619. 79 | |
| Less: 10 percent | 461. 98 | |
| | | 4, 157. 81 |
| | | 645, 113. 52(B) |
| Item A | | 805, 471. 13 |
| Less item B | | 645, 113. 52 |
| | | 160, 357. 61 |
| Less discount calculation | | 17, 265. 68 |
| Net due Shillito's | | 143, 091. 93 |

During this period, until the sale of its traditional installment accounts to the First National Bank of Chicago as of the close of business on February 1, 1964, petitioner as a part of its regular accounting procedure for book and tax purposes, maintained a reserve for bad debts as to its revolving budget accounts and other installment accounts (traditional installment accounts).

Following the examination of petitioner's income tax return for the fiscal year ended February 1, 1958, a revenue agent proposed disallowance of the deduction in respect of bad debts in the amount of $715,326.47. This amount represented the current addition to the reserve for bad debts which applied, in part, to the accounts receivable outstanding as of the close of that year which were subject to agreements with the various banks. On February 4, 1959, petitioner wrote a letter to the Conference Coordinator, Internal Revenue Service, Cin-

cinnati, Ohio, to sustain the allowance of the bad debt reserve. Such letter was as follows:

FEDERATED DEPARTMENT STORES, INC.
*222 West Seventh Street*
*Cincinnati 2, Ohio*

*February 4, 1959*
CLINTON F. HERBY,
OPERATING VICE PRESIDENT—TAXES

MR. ERNEST GREEN, Conference Coordinator
*Internal Revenue Service*
*Post Office Box 476*
*Cincinnati 1, Ohio*

Re: Federated Department Stores, Inc.

DEAR MR. GREEN:

Attached is a copy of Statement No. 6, Page 1, from Federated Department Stores, Inc.'s Audit Report prepared by Touche, Niven, Bailey & Smart, for the taxable year ended 2/1/58. The attached schedule shows the account balances as of 2/1/58 of all accounts due Federated including those sold to various banks.

Federated makes all collections on all of its accounts receivables, including those sold to the banks. Federated collects the carrying charge as earned on all accounts and pays to the banks an interest charge for the use of money secured from the banks. Generally, an interest rate is based on prevailing value at the prime commercial rate in either New York, Chicago or Boston. In addition to the payment of interest at the prime rate, Federated pays a commitment fee based upon the unused commitment as specified in the agreements with the various banks.

Federated is responsible for all bad debts. The stores have the option of repurchasing the delinquent accounts or by providing a 100% contract reserve against such account.

The purpose of the sale to the bank is to eliminate the debt from appearing on Federated's balance sheet. In form Federated uses the method of sale to bank, but in substance Federated is the owner of all the accounts and takes the risk for all bad debts.

In no case is the customer ever notified that the account has been sold to the bank, and all payments are made directly to Federated.

I am enclosing a copy of our Annual Report for the year ended 2/1/58 and you will note on page 15 that the total accounts are listed thereon with a deduction for accounts sold without recourse. It was necessary from the accounting standpoint that the accounts be sold without recourse in order that the debt does not appear on the company's balance sheet, however, actually Federated bears the risk for all worthless accounts through the repurchase of defaulted accounts.

Sincerely,

(S) Clinton F. Herby
CLINTON F. HERBY

The proposed disallowance of the addition to the bad debt reserve was reversed and the amount claimed was allowed.

As at February 2, 1963 (the last day of petitioner's fiscal year ended 1963), petitioner's deferred service charge reserve account consisted

of $2,836,628.95. Of said amount $2,130,397 was allocable to accounts sold to banks.

On December 23, 1963, petitioner wrote to the Commissioner requesting a ruling on its proposed sale of its installment accounts as of the close of business on February 1, 1964, which was the end of its taxable year so that it could adopt the installment method for reporting income in subsequent years.

In the request for ruling, petitioner stated:

A contract for the sale of all of Federated's revolving budget accounts and regular installment accounts as of the close of business on February 1, 1964, the end of its current taxable year, has been negotiated with the First National Bank of Chicago. A copy of the proposed contract is attached as Exhibit III. A summary of the contract is as follows:

1. The sale is made without recourse. Page 1.

2. The purchase price of the accounts is to be the amount owing thereon. Federated is to be paid 90% of the purchase price less a 2.037328% discount, with the remaining 10% being held by the bank in a contract reserve. Paragraph 2, Page 2.

3. Initial payment is to be made by the banks on January 31, 1964, on the basis of an estimate submitted by Federated. Upon determination of the actual amount sold, an adjustment shall be made for the difference plus interest. Paragraph 2, Pages 2 and 3.

4. Federated's records will be marked to indicate that the accounts have been sold. Paragraph 3, Page 3.

5. Federated will make collections on the accounts acting as agent for the bank. Paragraph 5, Page 5.

6. Collections shall be remitted to the bank monthly. The amount of the collections which will be retained by the bank for its account will be adjusted so that the contract reserve does not exceed 10% of the uncollected accounts, or 2% of the accounts sold, whichever is greater. Paragraph 7, Page 6, and Exhibit 2 of the contract.

7. If the actual collections are less than the anticipated collections determinable under the contract, Federated will pay an additional amount as liquidated damages. The bank is not required to pay Federated if actual collections exceed anticipated collections. Paragraph 7, Page 6.

8. The uncollected balance of delinquent accounts shall be charged against the contract reserve, but Federated has the option to repurchase such accounts. Paragraph 8, Page 7.

At this time, the estimated account balances as of February 1, 1964 are:

Revolving Budget Accounts_____ $107,390,000
Other Installment Accounts_____ 53,658,000

In conclusion, petitioner stated:

It is submitted that Federated's transaction with the First National Bank of Chicago constitutes a sale of its revolving budget accounts and regular installment accounts. The agreement with the bank uses the language of a sale and in substance provides for a sale since Federated is not liable to the bank for the repayment of any specific amount; the bank must look to the individual accounts which it purchased for the collection of the amount due. Furthermore, it is the intent of the parties that the accounts be sold.

And, on January 21, 1964, the Commissioner wrote petitioner as follows:

U.S. TREASURY DEPARTMENT
INTERNAL REVENUE SERVICE
*Washington 25, D.C.*

*January 21, 1964*
In reply refer to T:R:C:1:RCK

CLINTON F. HERBY, Assistant Treasurer
*Federated Department Stores, Inc.*
*222 West Seventh Street*
*Cincinnati, Ohio 45202*

DEAR MR. HERBY:

This is in reply to your letter dated December 23, 1963 in which a ruling is requested regarding the Federal income tax effect of the proposed transaction set forth herein involving certain customer accounts receivable.

The information furnished indicates that Federated Department Stores, Inc. (Company) operates department stores in certain major cities in the United States. The Company uses the accrual method of accounting and its taxable year is a 52-53-week year. At the close of business on February 1, 1964, the Company proposes to sell all of its installment accounts and revolving budget accounts owing on that date to The First National Bank of Chicago (Bank) and adopt the installment method for reporting income in subsequent years.

This sale is to be made under an agreement submitted with the ruling request of December 23, 1963. Among the provisions of this agreement, all of which are made a part hereof by reference, are (1) the sale of the accounts receivable to the Bank for an amount equal to the aggregate balances owing, less a discount of approximately 2.037328 percent thereof with a portion withheld (10 percent of the purchase price) to constitute a Reserve Account to which delinquent accounts and liquidated damages will be charged; (2) warranty as to the validity of the accounts sold; (3) collection of the accounts as agent for the Bank at the expense of the Company; (4) rebates or adjustments to obligors; (5) repurchase by the Company of accounts which fail to comply with the representations and warranties and an option to repurchase delinquent accounts.

Based solely on the information outlined above, it is held that (1) the transaction referred to herein between the Company and the Bank will constitute a sale of the accounts receivable as of the close of business on February 1, 1964; (2) collections made by the Company on behalf of the Bank will not be taxable to the Company under section 453(c) of the 1954 Code during the years of collection; (3) the entire balance in the Reserve for Bad Debts Account allocable to the accounts sold shall be restored to income in the year of sale; (4) any accounts which are repurchased will become part of the Company's installment accounts receivable and will be treated for Federal income tax purposes as if the accounts were never sold (see Rev. Rul. 54-43, C.B. 1954-1, 119, 122).

In accordance with a power of attorney on file, a copy of this letter is being sent to Mr. Robert A. Schulman, 1625 K Street NW., Washington, D.C. 20006.

Very truly yours,

(S) JOHN W. D. LITTLETON,
*Director, Tax Rulings Division.*

At the time members of the Commissioner's Tax Rulings Division, Washington, D.C., worked on the ruling, the Commissioner's agents

did not give consideration to, nor were they specifically aware of, the deferred service charge reserve nor to the fact that the deferred service charge reserve had not been reported in taxable income at the time of the issuance of that ruling. However, petitioner did attach two exhibits to its request for a ruling which disclosed the following information:

ACCOUNTS RECEIVABLE

| | Feb. 2, 1963 | Feb. 3, 1962 |
|---|---|---|
| Due from customers: | | |
| Thirty-day charge accounts | $50, 065, 561 | $49, 286, 210 |
| Deferred payment accounts | 151, 376, 189 | 138, 926, 903 |
| Other accounts receivable | 4, 394, 584 | 5, 046, 040 |
| | 205, 836, 334 | 193, 259, 153 |
| Less: | | |
| Provision for possible future losses and deferred service charges | 8, 029, 316 | 7, 773, 757 |
| Accounts sold without recourse (less Company's equity therein of $7,008,431 at Feb. 2, 1963) | 54, 736, 607 | 50, 160, 804 |
| | 62, 765, 923 | 57, 934, 561 |
| Net | 143, 070, 411 | 135, 324, 592 |

and

FEDERATED DEPARTMENT STORES, INC.

ANALYSIS OF RESERVE FOR BAD DEBTS

YE 2/2/63

| Type of account | Reserve per books | Reserve for Federal income tax purposes |
|---|---|---|
| 30-day charge | $632, 920 | $632, 920 |
| Revolving budget | 3, 156, 206 | 2, 738, 211 |
| Other installment | 1, 403, 561 | 1, 248, 081 |
| Total | 5, 192, 687 | 4, 619, 212 |

At the close of business on February 1, 1964 (the last day of its fiscal year ended 1964), petitioner, pursuant to an agreement (the terms of which had been described in petitioner's letter to the Commissioner of December 23, 1963), sold to the First National Bank of Chicago all of its accounts receivable except its 30-day accounts for $155,-295,052. Petitioner, in recording (for book and tax return purposes) the sale of its accounts receivable, insofar as is here material, did as follows:

| | |
|---|---|
| Reduced its accounts receivable by | $155, 295, 052. 00 |
| Set up a contract reserve of | 15, 529, 506. 00 |
| Deducted discount expense of | 3, 141, 018. 25 |
| Increased its cash by | 136, 624, 527. 75 |

In addition, in its income tax return for its fiscal year ended February 1, 1964, petitioner, in accordance with holding (3) of the ruling

of the Commissioner of Internal Revenue dated January 21, 1964, made the following adjustment in Schedule M–1, Item 5:

> (b) Restoration to income of tax reserve for bad debts as of 2/1/64 on Revolving Budget Accounts and Other Installment Accounts (Traditional Installment Accounts) due to the sale of said accounts _____ $3,418,910.92

Included in the $155,295,052 accounts receivable balance were deferred service charges of $2,831,782.44, which had not been or were not put into income in the year ended February 1, 1964, and, therefore, remained in the deferred service charge reserve account.

As at February 1, 1964, petitioner, in addition to the accounting entries set forth above, computed its income from service charges in the same manner as if it had not sold its traditional installment accounts to the bank.

Because we have found the deferred service charges ($2,831,782.44) must be recognized as income at the time the accounts were sold to FNB, petitioner contends in the alternative that this constitutes a change of accounting instituted by the Commissioner and that the provisions of section 481(a)[3] are applicable. Thus, petitioner argues that any adjustment in respect of any taxable year prior to 1954 would not be proper, so that the amount of income petitioner must recognize would be reduced by that amount which is attributable to petitioner's pre-1954 taxable years ($1,741,180). See secs. 1.481–1(a)(2), 1.481–1 (c)(3), and 1.418–3, Income Tax Regs. Petitioner asserts the present treatment accorded this material item (the deferred service charges) differs from petitioner's previous accounting treatment for these charges and that the difference in treatment constitutes a change in accounting method. Secs. 1.481–1(a)(1), and 1.446–1(e)(2)(i), Income Tax Regs.

The Commissioner counters by arguing that the bank transactions occurring prior to 1964 were not similar to the sale of the accounts to FNB on February 1, 1964, and therefore section 481 is inapplicable.

A change of accounting must be with respect to a "material item." Sec. 481(a). Fundamentally, the item itself must be basically the same

---

[3] SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

as an item previously accounted for with the present method of accounting differing from the prior treatment. Unless the transactions are basically the same, the accounting treatment would not be "change" of accounting but only a "new" accounting method for a different transaction. Thus, the issue is whether the pre-1964 transactions were in substance the same as the sale of the accounts on February 1, 1964, to FNB.

From the facts presented, we believe the bank transactions prior to 1964 differ so materially from the sale of accounts to FNB that no "change of accounting" under section 481 was involved herein. Initially, the petitioner did not intend nor believe that the pre-1964 bank transactions were "in substance" a sale of the accounts even though cast in that form. This intention was evidenced by the following statement in a letter by petitioner's vice president, Clinton F. Herby, to the Conference Coordinator, Internal Revenue Service, Cincinnati, Ohio, requesting the nondisallowance of petitioner's bad debt reserve on installment accounts assigned to the various banks in the pre-1964 transactions: "In form, Federated used the method of sale to bank, but in substance Federated is the owner of all the accounts and takes the risk for all bad debts." The conference coordinator subsequently granted petitioner's request and allowed a bad debt reserve for these accounts.

Subsequently, petitioner requested a private ruling on its February 1, 1964, sale of the accounts to the FNB, and petitioner's assistant treasurer made the following statements:

[Petitioner] intends to sell all of its installment accounts receivable as of the close of business on February 1, 1964 which is the end of its taxable year and adopt the installment method for reporting income in subsequent years. We desire a ruling that the collection in subsequent years of the accounts, which are being sold will not result in the recognition of additional income.

\*      \*      \*      \*      \*      \*      \*

*Conclusion*

It is submitted that Federated's transaction with the First National Bank of Chicago constitutes a sale of its revolving budget accounts and regular installment accounts. The agreement with the bank uses the language of a sale and in substance provides for a sale since Federated is not liable to the bank for the repayment of any specific amount; the bank must look to the individual accounts which it purchased for the collection of the amount due. Furthermore, it is the intent of the parties that the accounts be sold.

It is respectfully requested that the Internal Revenue Service rule:

1. That all of Federated revolving budget accounts and regular installment accounts as of the close of business on February 1, 1964, are being sold to the First National Bank of Chicago; and

This request was also granted in favor of petitioner in a letter that stated in part:

it is held that (1) the transaction referred to herein between the Company and the Bank will constitute a sale of the accounts receivable as of the close of business on February 1, 1964; * * *

(3) the entire balance in the Reserve for Bad Debts Account allocable to the accounts sold shall be restored to income in the year of sale; * * *

Clearly, petitioner believed as it contended to the Commissioner, that in the first instance the accounts were only security for the bank loans; while in the second instance petitioner fully intended to "sell" these accounts to FNB in order to "adopt the installment method for reporting income in subsequent years."

Furthermore, in other respects, the pre-1964 agreements differed significantly from agreement for the sales of the accounts to FNB on February 1, 1964. Importantly, in the pre-1964 transactions, petitioner was required to pay the prime interest rate plus one-half of 1 percent monthly on the exact amount which had not been repaid to the bank, while by the 1964 sale agreement with FNB, the accounts were sold for one price, the face amount less a discount with 10 percent of the sales price being retained for contingencies. To us, again this clearly indicates that the pre-1964 transactions were only loans with the interest charged subject to monthly adjustments and with petitioner using the accounts as security. By contrast, the agreement with FNB provided for one price only for the accounts.

The pre-1964 agreements normally were of a continuing nature with a duration of 5 years. Under the agreements, the banks were obligated to "purchase" all the accounts offered up to a maximum dollar amount. However, under the 1964 transaction, the agreement was a "one-shot" sale of all revolving budget accounts and regular installment accounts on hand as of February 1, 1964.

Further, under the pre-1964 transactions, when any account became delinquent it was charged against the contract reserve with petitioner in effect required to pledge future accounts in its stead. Repayment of the sales price was guaranteed by the 10-percent reserve and by petitioner's accounts to be created in the future. If the contractual reserve fell below 10 percent of the amount due on the accounts, the bank would retain 20 percent of the accounts transferred to the banks in the future as a reserve. The provision for the retention of 20 percent continued until such time as the reserve again reached 10 percent of the amounts due on the accounts. Petitioner was required to maintain a minimum reserve of 10 percent plus 100 percent of the amount on defaulted accounts.

By contrast, the agreement with FNB specified that when a sold account became delinquent, FNB was limited only to the 10-percent reserve for reimbursement plus a minimal amount for liquidated damages.

Under the pre-1964 agreements, petitioner set up a reserve for bad debts for these installment and revolving accounts. However, with respect to these accounts which were sold to FNB on February 1, 1964, petitioner did not continue the bad debt reserve but instead closed out the account taking into income on that date the amount in reserve for these accounts.

The reason for this was, as petitioner contended in its letter to the conference coordinator, the pre-1964 agreement did not actually provide for the sale of the account, although that was the form in which the security device was cast. However, in the latter transaction with FNB, petitioner agreed with the Commissioner's letter ruling that the accounts were sold and that it would be necessary for the bad debt reserve to be taken into income, because of the sale.

Accordingly, from all the facts presented, including the ones mentioned above, we believe that the FNB sales agreement differs substantially from the pre-1964 transactions and that the accounting treatment accorded these sales did not constitute a change of accounting method under section 481. Thus, petitioner is not entitled to any adjustments under section 481 but must recognize the total amount of deferred service charges ($2,831,782.44) as income on February 1, 1964, the time of the sale to FNB.

### Contributions to Capital Issue

Sharpstown Realty Co. (hereinafter referred to as Sharpstown) was incorporated under the laws of the State of Texas for the principal purpose of developing 2,500 acres of unimproved land it owned located in the Sharpstown area of the City of Houston, Tex. It proposed to construct and operate a shopping center on 115 of those acres and to develop and sell the remaining acres for residential and commercial purposes.

Neither petitioner nor any of its stockholders owned any interest in Sharpstown. And neither Sharpstown nor its stockholders owned any interest in petitioner.

Sharpstown believed that the development of its shopping center and the sale of its other lands would be accelerated and would produce greater income for Sharpstown if petitioner could be induced to open a full-line department store in the shopping center. Furthermore, Sharpstown believed that as long as petitioner maintained a branch store of its Foley's division at the shopping center, Sharpstown would attract additional customers, obtain better tenants, and receive a greater rental income on its percentage of sales leases. The installation and operation of a store commensurate with Foley's reputation in the proposed center would have involved a substantial investment which petitioner may not have been willing to make at that time in an area

whose economic potential was regarded as speculative. Therefore, in order to persuade petitioner to obligate itself to open and operate a Foley's store in Sharpstown's proposed shopping center, Sharpstown offered substantial inducements to petitioner.

After extended and intensive arm's-length bargaining, Sharpstown and petitioner entered into an agreement dated December 17, 1959, in which Sharpstown agreed to convey to petitioner in fee and at no cost to petitioner, a 10-acre tract of land situated in Sharpstown's proposed shopping center. In addition, Sharpstown agreed to pay to petitioner the sum of $200,000 per year for a consecutive 10-year period beginning July 1, 1960. In return, petitioner agreed to construct, equip, open, and operate a full-line Foley Branch Department Store on the tract of land conveyed to petitioner.

Pursuant to this agreement, petitioner, at its own cost during its fiscal year ended February 3, 1962, completed the construction and equipment of a building in the Sharpstown shopping center at a total original cost per books and tax return of $1,956,339.52.

Pursuant to the agreement, Sharpstown paid to petitioner during petitioner's fiscal year ended February 2, 1963, $200,000 and during its fiscal year ended February 1, 1964, $400,000. Petitioner applied these payments in reduction of its cost basis for the building built in the Sharpstown shopping center and any excess was then applied to the equipment placed in the building by petitioner.

In the explanation of adjustments attached to the notice of deficiency, the Commissioner stated:

> It has been determined that $200,000.00 [$400,000] received in the fiscal year ended February 2, 1963 [Feb. 1, 1964] from Sharpstown Realty Company is includible in income under section 61 of the Internal Revenue Code of 1954.
>
> \*  \*  \*  \*  \*  \*  \*
>
> Additional depreciation of $4,000.00 [$11,936.50] is allowed on the building constructed at Sharpstown, the basis of which had been incorrectly reduced by the payment received from the Sharpstown Realty Company. \* \* \*

Thus, the issue is whether petitioner must recognize as income $200,000 and $400,000 received by it during the fiscal years ending February 2, 1963, and February 1, 1964, respectively. Simply stated, the question is whether a retail company must recognize as income payments received from a land developer which were made to induce the retailing company to locate one of its stores on land given by the developer.

The Commissioner asserts that this is income under the broad scope of section 61 [4] and *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S.

---

[4] SEC. 61. GROSS INCOME DEFINED.

(a) GENERAL DEFINITION.—Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, \* \* \*

426 (1955). As such, he claims that petitioner was in error for excluding it from its taxable income and also reducing its basis in the Sharpstown building and equipment in the amount of these receipts.

To the contrary, petitioner asserts that the receipts are excludable from its income under section 118 [5] and that correspondingly it is required to reduce its basis in the Sharpstown building and equipment by the amount of these receipts as provided under section 362(c)(2). [6]

The Commissioner quotes the following language from section 1.118–1, Income Tax Regs.: "However, the exclusion does not apply to any money or property transferred to the corporation in consideration for goods or services rendered." The Commissioner relies upon *United Grocers, Ltd.* v. *United States*, 308 F.2d 634 (C.A. 9, 1962), asserting that motive and intent of the payor in making the payments is the dominant factor in determining whether they are a capital contribution or payment for goods or services. As such, the Commissioner believes that here Sharpstown's motive for making the payments and the distributing of the land to petitioner were purely for business reasons as it was in the "best business interest for the success of Sharpstown to induce Federated to locate a branch in its shopping center." Thus, the payments never bore a semblance of a donation or contribution but rather were made solely in exchange for petitioner's promise to construct, open, and operate a branch store in the developer's shopping center. The Commissioner vigorously contends that the payments were made "in consideration for goods or services rendered (or to be rendered)," and that section 118 is inapplicable to the facts herein.

We do not agree with the Commissioner. We have held that where a taxpayer receives money, land, or other consideration to induce him

---

[5] SEC. 118. CONTRIBUTIONS TO THE CAPITAL OF A CORPORATION.

(a) GENERAL RULE.—In the case of a corporation, gross income does not include any contribution to the capital of the taxpayer.

(b) CROSS REFERENCE.—For basis of property acquired by a corporation through a contribution to its capital, see section 362.

[6] SEC. 362. BASIS TO CORPORATIONS.

(c) SPECIAL RULE FOR CERTAIN CONTRIBUTIONS TO CAPITAL.—

\* \* \* \* \* \* \*

(2) MONEY.—Notwithstanding subsection (a)(2), if money—

(A) is received by a corporation, on or after June 22, 1954, as a contribution to capital, and

(B) is not contributed by a shareholder as such,

then the basis of any property acquired with such money during the 12-month period beginning on the day the contribution is received shall be reduced by the amount of such contribution. The excess (if any) of the amount of such contribution over the amount of the reduction under the preceding sentence shall be applied to the reduction (as of the last day of the period specified in the preceding sentence) of the basis of any other property held by the taxpayer. The particular properties to which the reductions required by this paragraph shall be allocated shall be determined under the regulations prescribed by the Secretary or his delegate.

to construct and operate a railroad and accompanying facilities,[7] warehouse facilities,[8] and to locate other plants and factories[9] in certain locales that these payments are contributions to capital coming within the ambit of section 118.[10]

The situation herein is not one where the petitioner is receiving money from a present or future customer so that Sharpstown may receive the petitioner's goods at a lower price. See *United Grocers, Ltd. v. United States, supra.* Instead, this payment was only made to induce the petitioner to locate a store in a certain area which we believe was Sharpstown's way of sharing the risk with petitioner by putting up some of the initial venture capital. We do not think it necessary to qualify as a capital contribution that the transaction have the attributes of a gift. See excerpt from Senate committee report below. We have held where contributors anticipate only the indirect benefit of increased business in the community or the availability of facilities so constructed with the contributions, that this constitutes contributions to capital. See *Frank Holton & Co.*, 10 B.T.A. 1317 and *Great Northern Railway Co., supra.*

Congress adopted the theory of the aforementioned cases when it enacted section 118. The Senate Finance Committee report (S. Rept. No. 1622, 83d Cong., 2d Sess., p. 18 (1954)) on section 118 stated:

The House and your committee's bill provide that in the case of a corporation, gross income is not to include any contribution to the capital of the taxpayer. This in effect places in the code the court decisions on this subject. It deals with cases where a contribution is made to a corporation by a governmental unit, chamber of commerce, or other association of individuals having no proprietary interest in the corporation. In many such cases because the contributor expects to derive indirect benefits, the contribution cannot be called a gift; yet the anticipated future benefits may also be so intangible as to not warrant treating the contribution as a payment for future services.

Therefore, we believe that petitioner's promise to construct, open, and operate one of its stores on certain land, falls within the phrase of "an intangible future benefit * * * so intangible as to not warrant treating the contribution as a payment for future services." Accord-

---

[7] *Edwards* v. *Cuba Railroad,* 268 U.S. 628, 45 S.Ct. 614; *Great Northern Railway Co.,* 8 B.T.A. 225, affd. 40 F.2d 372 (C.A. 8, 1930); *Texas & Pacific Railway Co.,* 9 B.T.A. 365; *Atlantic Coast Line Railway Co.,* 9 B.T.A. 1193; *Midland Valley Railroad Co.,* 19 B.T.A. 423 affd. without discussion on this point 57 F.2d 1042 (C.A. 10, 1932); *Kansas City Southern Railway Co., et al.,* 16 B.T.A. 665, reversed on other points 52 F.2d 372 (C.A. 8, 1931).

[8] *Aransas Compress Co.,* 8 B.T.A. 155; *Kauai Railway Co., Ltd., et al.,* 13 B.T.A. 686.

[9] *Brown Shoe Co.* v. *Commissioner,* 339 U.S. 583 (1950); *Aransas Compress Co., supra.* G.C.M. 16952, 1937–1 C.B. 133; G.C.M. 1581, VI–1 C.B. 197.

[10] We are aware that all the cases cited above were decided prior to any section in the Internal Revenue Code that was similar to sec. 118; however, the intention of Congress in enacting this section was to codify to existing law developed through these decisions S. Rept. No. 1622, 83d Cong., 2d Sess., p. 190.

ingly, we hold that payments received by the petitioner come within the scope of section 118 and were properly excludable from petitioner's income.

Correspondingly, we hold petitioner also properly reduced its basis in the Sharpstown building and equipment in the amount of the moneys received as prescribed under section 362(c)(2).

Reviewed by the Court.

*Decision will be entered under Rule 50.*

RAUM and TANNENWALD, *JJ.*, did not participate in the consideration and disposition of this case.