DORRIS H. DEASON, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Deason v. Commissioner
Docket No. 8114-73.
United States Tax Court
T.C. Memo 1976-224; 1976 Tax Ct. Memo LEXIS 181; 35 T.C.M. (CCH) 978; T.C.M. (RIA) 760224; July 19, 1976, Filed S. P. Keith, Jr., for the petitioner. Robert W. West, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in Federal income tax of petitioner Dorris H. Deason and her husband, Earnest N. Deason, in the amount of $29,111.04 and an addition to tax under section 6653(a), I.R.C. 1954, [1] in the amount of $1,455.55 for the calendar year 1969. Because of a concession made by respondent at the trial, the only issues remaining for our decision are (1) whether petitioner Dorris H. Deason and her husband, equal stockholders of an electing small business corporation, received taxable income for the calendar year 1969 from the payment of $531,103.18 by the Federal Government to that corporation during its fiscal year ending August 31, 1969, under the terms of a contract between that corporation and *183 the United States Department of Labor, and (2) whether petitioner is liable for an addition to tax under section 6653(a) for negligence or intentional disregard of respondent's rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner Dorris H. Deason (petitioner) resided in Birmingham, Alabama at the time of the filing of her petition in this case. Petitioner and her husband, Earnest N. Deason, filed a joint Federal income tax return for the calendar year 1969. Portion-Redi Foods, Inc. (Redi), an electing small business corporation under section 1371, was incorporated under the laws of the State of Alabama in 1961. During the calendar year 1969 Redi, the outstanding stock of which was equally owned by petitoner and her husband, was engaged in the principal activity of processing and selling meat products. Petitioner was vice president and secretary and her husband was president of Redi. On or about July 22, 1968, Redi in anticipation of its expansion submitted a proposal in the amount of $942,123.78 to the Manpower Administration *184 of the United States Department of Labor with respect of its job opportunities in the business sector (JOBS) program to hire, to test, to train and cross train and to permanently employ 200 unemployed individuals of which 80 to 90 percent would be women. Redi intended to continue to train those it permanently employed in those trades which were apprenticeable. Of the 200 individuals to be trained in the meatpacking industry, 152 were to be trained in production trades, 16 in management and administrative work, and 32 in the mechanical trades. The training program for an individual would consist of a 52-week period which would include an orientation period of 24 hours, counseling of 20 hours, classroom instruction of 132 to 339 hours, and on-the-job training of 998 to 1852 hours, depending on the job classification for which an individual would be trained. The unemployed persons that the corporation would hire and train were to be primarily referred to the corporation and certified by the Alabama State Employment Service (ASES) and from these eligible individuals the corporation would select those individuals that met certain health standards. The 12-month training program would *185 commence on August 12, 1968, with an initial group of 30 individuals, with other groups of various sizes beginning at later dates through March 4, 1969. The amount to be paid to the corporation with respect to any individual that was being trained was to be based on the daily fixed unit cost for the job title for which such individual was being paid wages. The daily fixed unit cost per individual with respect to each job title was determined as follows: MAXIMUM
NUMBER OF
GRAND
TOTAL
TOTAL
TOTAL
EMPLOYEES
TOTAL
HOURS
HOURS
HOURS
JOB TITLE
JOB TITLE
HOURS
ORIENTATION
CLASSROOM
OJT
Management Trainee
10
20,800
240
3,150
17,410
Foreman
20
41,600
480
4,080
37,040
Butcher
80
166,400
1,920
16,320
148,160
Cook
50
104,000
1,200
10,200
92,600
Boner
2
2,288
48
224
2,016
Repairman-Industrial
6
12,480
144
1,224
11,112
Truck
Scale Mechanics
2
4,160
48
408
3,704
Refrigeration Mechanic
3
6,240
72
612
5,556
Millright Mechanic
12
24,960
288
2,448
22,224
Electrical Repairman
3
6,240
72
612
5,556
Boilerhouse Repairman
2
4,160
48
408
3,704
Plumber-Maintenance
2
4,160
48
408
3,704
Industrial Truck
2
2,720
40
272
2,408
Operator
Inventory Clerk
2
4,160
48
408
3,704
General Office Clerk
4
8,320
96
816
7,408
Totals
200
412,688
4,792
41,590
366,306
*186 WAGE
FIXED
MAXIMUM
FIXED
RATE
UNIT
PAYMENT FOR
UNIT COS
JOB TITLE
START
COST
JOB TITLE
PER DAY *
Management Trainee
$2.25
$5,797.25
$ 57,972.50
$ 22.29
Foreman
2.00
5,232.66
104,653.20
20.13
Butcher
1.75
4,6 94.20
375,536.00
18.05
Cook
1.75
4,694.79
234,739.50
18.05
Boner
1.60
2,386.37
4,772.74
9.18
Repairman-Industrial
1.65
4,479.06
26,874.36
17.23
Truck
Scale Mechanics
1.60
4,371.18
8,742.36
16.81
Refrigeration Mechanic
1.60
4,371.18
13,113.54
16.81
Millright Mechanic
1.60
4,371.18
52,454.16
16.81
Electrical Repairman
1.60
4,371.18
13,113.54
16.81
Boilerhouse Repairman
1.60
3,940.08
7,880.16
15.15
Plumber-Maintenance
1.60
3,940.08
7,880.16
15.15
Industrial Truck
1.60
2,464.22
4,928.44
9.48
Operator
Inventory Clerk
1.85
4,910.52
9,821.04
18.89
General Office Clerk
1.85
4,910.52
19,642.08
18.89
Totals
$942,123.78
The fixed unit cost with respect to any job title was determined by adding the following amounts: (1) Direct labor costs, which was the annual gross amount that the corporation paid an individual as wages *187 less 40 percent of the wages attributable to on-the-job training; (2) payroll taxes, which was 7.5 percent of the amount of the direct labor costs; (3) the indirect labor and plant overhead costs, which was an amount equal to 24 percent of the wages attributable to on-the-job training except for industrial truck operators and management trainees it was 12 percent and for boiler repairmen and plumber-maintenance men it was 18 percent; (4) general and administrative costs, which was an amount equal to 20 percent of the direct labor costs except for industrial truck operators, plumber-maintenance men or boiler repairmen it was 10 percent; (5) classroom costs, which was an amount equal to the proportionate amount of the salaries of $130,000 for the 18-man professional staff and of the school expenses of $43,000 based on the hours of classroom instruction that an individual received and the total hours of instruction of 45,600; [2] and (6) other costs in the amount of $54.61 for each individual's ratable share of the costs of the medical services provided. On August 5, 1968, Redi and the United States of *188 America by its agent agreed that in consideration of payment by the United States of an amount not to exceed $942,124 Redi would provide work in accordance with its proposal which was incorporated by reference as part of the contract. [3] The terms of the contract provided for Redi to hire individuals that had been certified as eligible by the ASES or related agency and to submit monthly invoices which among other data required with respect of each job title the number of aggregate trainee days worked and the daily unit cost from which the total reimbursement earned was determined. Payments under the contract were to be computed by multiplying the total days for which wages were paid under each job title by the daily fixed unit cost per individual within that job title. The contract provided that if Redi failed to perform under the contract then the Government's agent could cancel the contract upon written notice to Redi and its failure to remedy the condition within 10 days of the receipt of such notice. In such event the contract provided Redi would be paid to the date of cancellation for each individual. The contract further provided that if the contract were canceled for the *189 convenience of the Federal Government or if an individual terminated his employment with the corporation, in the event of that individual's death, incarceration, permanent disability, illness, return to school, military service or acceptance of a different job at a higher pay, Redi would be paid the daily fixed unit cost per individual per job title until the date of cancellation or termination plus an amount equal to 25 percent of that amount unless such aggregate amount exceeded the total fixed unit cost per individual per job title. The contract provided that Redi had the right to discharge any individual in accordance with its rules and that substitution for such terminated individuals was permissible. *190 The individuals that were hired and trained under the contract received on-the-job training in the general operation of the business. Some of these individuals were physically and mentally handicapped or otherwise disadvantaged and generally were not as productive as individuals that had been hired by Redi independently of its contract under the JOBS program. During its fiscal year ending August 31, 1968, Redi had accrued or received the amount of $4,781.82 in accordance with the terms of the contract. During its fiscal year ending August 31, 1969, Redi received from the United States Government or accrued under the contract the amount of $531,103.18 in connection with the training of individuals it had hired in accordance with the contract. Of this amount $10,463 represented the bonus that Redi received upon the termination of some of the individuals that it had hired under the circumstances provided under the contract. On December 30, 1969, Redi filed a U.S. Small Business Corporation Income Tax Return (Form 1120S) for its fiscal year ending August 31, 1969, with the Director of the Internal Revenue Southeastern Service Center, Chamblee, Georgia. Redi reported a taxable *191 loss of $497,387.60 and did not include in its income the amount of $531,103.18 which it had received from the United States Government or had accrued under the contract. However, it did include such amount as part of the amount of $683,186.91 which it had reported in Schedule M-1, item 7, "Income recorded on books this year not included in this return (itemize)," as "Grant from U.S. Gov't." In its return for its taxable year 1969 Redi deducted the amount of wages it paid to employees it hired under the contract as a cost of goods sold. Redi was adjudged bankrupt in 1972 and most of its records which had been located at its place of business were pilfered or destroyed. Petitioner's husband was adjudged bankrupt on September 7, 1973.
In their joint return for the calendar year 1969 petitioner and her husband reported a taxable loss of $464,167.59 which they represented was the loss that they sustained as a result of Redi's operations. In his notice of deficiency to petitioner and her husband respondent determined that Redi had income for its fiscal year 1969 of $38,497.30 rather than a loss and that this income was taxable to petitioner and her husband. The amount of Redi's *192 taxable income for its fiscal year 1969 was arrived at by respondent by including in Redi's taxable income for its taxable year ending August 31, 1969, the amount of $535,885. [3] Respondent explained that the amount of $535,885 "received and/or accrued as of August 31, 1969 from the Department of Labor represents taxable compensation for services for training employees under a contract with the Department of Labor." Petitioner and her husband filed their petition in this case on November 9, 1973. By order dated March 6, 1974, this Court dismissed for lack of jurisdiction the case of petitioner's husband. In petitioner's amended petition dated March 6, 1974, she alleged that she had been declared bankrupt on June 26, 1974. OPINION Both parties recognize that any undistributed taxable income which Redi had for its fiscal year ending August 31, 1969, constitutes taxable income to petitioner and her husband for the calendar year 1969 under section 1373.Whether Redi had taxable income or a loss in its final year 1969 depends on whether the payments it received or accrued under its Government *193 contract are includable in its gross receipts. Petitioner contends that the amount of $531,103.18 which was received or accrued by Redi during its fiscal year ended August 31, 1969, from the United States Department of Labor under the terms of the contract was not includable in the income of the corporation but was excludable as a contribution to its capital under section 118(a). Petitioner argues that the United States Department of Labor, a governmental unit, expected to receive for the payments only indirect benefits under the contract for the general welfare of the community. Petitioner relies on Federated Dept't Stores v. Commissioner,426 F. 2d 417 (6th Cir. 1970), affg. 51 T.C. 500 (1968). Lastly, petitioner's contention is that if we determine she is liable for any tax for the calendar year 1969 that such liability should be discharged under the Bankruptcy Act. Respondent contends that the amount of $531,103.18 paid or accrued by Redi on account of its contract with the Federal Government constituted taxable income insomuch as such amount represented compensatory payments for Redi's services of training employees in meat processing skills, *194 and did not constitute a contribution to capital. Respondent points out that in United States v. Chicago, Burlington & Quincy R. Co.,412 U.S. 401, 413 (1973), the Court specifically stated that one of the characteristics of a nonshareholder contribution to capital under the Revenue Code is that it "may not be compensation, such as a direct payment for a specific, quantifiable service provided for the transferor by the transferee." Lastly, respondent contends that petitioner is liable for the addition to tax under section 6653(a) for the calendar year 1969 for her and her husband's negligence or intentional disregard for respondent's rules and regulations. To provide the national economy with more and better trained personnel, to reduce the costs of public assistance and to alleviate the hardships of unemployment, Congress enacted the Manpower Development and Training Act of 1962 subsequently reenacted as the Manpower Act of 1965 which provided that persons who can be qualified through education and training be sought out and trained.Manpower Act of 1965, Pub. L. 87-415, tit. I, sec. 101, Mar. 15, 1962, 76 Stat. 23; Pub. L. 88-214, sec. 1, Dec. 19, 1963, 77 Stat. *195 422; Pub. L. 89-15, sec. 2, Apr. 26, 1965, 79 Stat. 75; 42 U.S.C. sec. 2571-2616, repealed effective July 1, 1974. To accomplish this objective, Congress authorized the Secretary of Labor to enter into agreements with qualified employers among others to provide on-the-job training programs which adhered to appropriate training standards. 42 U.S.C. sec. 2584, [4] amended by Pub. L. 90-636, sec. 6, October 24, 1968, 82 Stat. 1353, repealed effective July 1, 1974.To induce private industry to employ and train certain hard-core unemployed, the Secretary of Labor established the job opportunities in the business sector (JOBS) program which reimbursed an employer at levels substantially in excess of those provided under other on-the-job training projects that employed such individuals for the extraordinary cost necessary to properly train them. The Labor Department was to provide sufficient technical assistance to private industry to insure that the individuals employed received adequate training, counseling, and support, and that they remained steadily employed. However, the Labor Department was to develop procedures to assure that reimbursements *196 were not offered unnecessarily. *197 Section 61 provides that gross income means all income from whatever source derived, including compensation for services. Section 118 provides that gross income does not include any contribution to the capital of a corporation. Section 118 applies to contributions to capital made by nonshareholders. Section 1.118-1, Income Tax Regs. The issue for our decision is whether the payments received by Redi during its fiscal year ending August 31, 1969, from the Federal Government under the terms of the contract were gross income to Redi or excludable from Redi's gross income as a contribution to its capital under section 118.
Property contributed to a corporation for the purpose of inducing it to locate its business in a particular community, or for the purpose of inducing it to expand its operating facilities, see Brown Shoe Co. v. Commissioner,339 U.S. 583 (1950), is excludable, but property transferred to a corporation in consideration for goods or services *198 rendered is not excludable; United States v. Chicago, Burlington & Quincy R. Co., supra.Section 1.118-1, Income Tax Regs.
Petitioner argues that the payments were for general welfare of the community and that any benefit that the Federal Government could have expected to derive from its payments to Redi was so remote, speculative and intangible that the payments could not be properly considered to have been for services rendered by Redi. Respondent argues that under the contract Redi trained individuals in the meat processing trade and as compensation therefor received a specified sum of money that was directly related to the services performed. We conclude that the payments which Redi received under its Government contract were for services rendered and were not contributions to its capital. The monies that were paid to Redi each month were determined from the monthly invoices that Redi submitted which provided the information necessary to compute the amount of the payment for that month. The amount of payment was based on the total days for which wages were paid under each job title times the fixed unit cost per employee per *199 day within that job title. Redi determined the fixed unit cost per employee per job title in the manner set forth in our findings. In every instance the amount thus determined for each job title was at least 60 percent of the wages paid for on-the-job training and was equal to or in excess of the amounts paid for payroll taxes and the direct costs of providing classroom instruction, counseling and medical services with respect to each trainee-employee. While one of the purposes for the acts which authorized the Secretary of Labor to enter into a contract under the JOBS program was to reduce unemployment and consequently the need for public assistance which undoubtedly served a general public goal, the payments by the Federal Government to Redi under the contract which was authorized and funded under such acts were part of the direct compensation to Redi for the training services which it provided in accordance with its proposal which had been incorporated as part of the contract. It is clear that Congress did not intend that the Secretary of Labor would enter into an agreement with an employer that otherwise would hire and train disadvantaged, unemployed individuals. It is clear *200 under the terms of the proposal that Redi offered a service that the Government sought and that Redi was to be recompensed for the service provided. The contract does not indicate by its terms that the Government made the payments for the general welfare of the community or that the amounts paid were in the nature of a subsidy although they were based on the extraordinary costs incurred. Although Redi had not been in the business of providing training services before 1968, it is clear that at the time it made its proposal Redi intended to expand its plant facilities and to employ and train 200 additional personnel to operate its enlarged facilities. Consequently, Redi considered it to its own advantage to enter into the business of providing training services in the meatpacking industry since it would be compensated for the training services rendered as well as provide for its own needs for additional employees. The nexus between the payment and the training services provided by Redi is particularly demonstrated by the contractual provision which increased the amount otherwise payable to the corporation by 25 percent in the event the individual that was being trained by Redi terminated *201 his employment because of his death, disability, illness, his return to school, reentry into military service or acceptance of other employment at a higher salary. It is clear that this amount represented additional compensation to Redi for its training services since it would protect Redi from any loss occasioned upon the unilateral termination of the individual's employment and since it would provide an incentive for Redi to render the quality of training that would be required for an individual it had hired to achieve better employment on his own, enter military service or to return to school. The services that Redi obligated itself to provide were directly related to fulfilling the required services that the Department of Labor expected to receive since Redi only received payment upon the completion of its services and then only to the extent services were actually rendered and properly performed under the contract.The payments that Redi received were not earmarked for permanent capital investment in its business although some part of the amounts may have been so invested.See United States v. Chicago, Burlington & Quincy R. Co.,supra.
Petitioner's reliance *202 on Federated Dep't Stores v. Commissioner,supra, is misplaced.Under the facts of that case, a parcel of land was transferred and payments were made by a transferor to a corporation to induce it to construct and operate its department store on the land transferred which was adjacent to land retained by the transferor, thereby promoting the transferor's financial interests in the retained land. The Court of Appeals concluded as we had that the payments were excludable from the recipient corporation's gross income as a contribution to capital since the expected benefit was too speculative and intangible to constitute a payment for future services. However, under the circumstances here the Federal Government's expected benefits under the contract were to be immediately realized and the payments and the benefits to be derived therefrom were directly related to one another since the payments were based on the rendition of training services. For the foregoing reasons we conclude that the payments under the contract were the price of the service provided and consequently such payments were not excludable from Redi's income. Therefore, the amounts Redi received *203 or accrued under the contract during its fiscal year ended August 31, 1969, are includable in Redi's income and the income of Redi for its fiscal year 1969 is includable in the income of petitioner and her husband under section 1373 for the calendar year 1969. Petitioner contends that any tax liability that she may have for the calendar year 1969 is dischargeable under the Bankruptcy Act. Act of June 22, 1938, ch. 575, sec. 2(12), 52 Stat. 842; Pub. L. 91-467, sec. 1, Oct. 19, 1970, 84 Stat. 990; 11 U.S.C. sec. 11(a)(12), [5] grants the Bankruptcy Court express jurisdiction to discharge bankrupts and to determine dischargeability of debts, including under certain circumstances taxes legally due and owing by the bankrupt to the United States. Since the petitioner was adjudged a bankrupt subsequent to the filing of her petition in this case, we have jurisdiction to determine her tax liability. However, this Court does not have jurisdiction under the Bankruptcy Act to determine the dischargeability of debts including taxes, and consequently we do not reach petitioner's contention that her debts relating to her tax liability for 1969 are dischargeable. *204 Although she does not argue the point on brief, petitioner assigned error to respondent's determination that she is liable for an addition to tax for 1969 due to her or her husband's negligence or intentional disregard of respondent's rules and regulations. Respondent's imposition of an addition to tax under section 6653(a) is presumptively correct and the burden is upon petitioner to show that the addition to tax for negligence was improperly imposed. David Courtney,28 T.C. 658, 669 (1957). Petitioner has introduced no evidence that she or her husband were not negligent or that they did not intentionally disregard respondent's rules and regulations other than to state that Redi's records had been stolen or destroyed by vandals. Petitioner has failed to show that she and her husband kept regular books of account indicating their income and expenses. Petitioner has not shown that respondent's imposition of the addition to tax for negligence was erroneous and consequently we sustain respondent's determination of an addition to tax under section 6653(a). We hold that petitioner is liable for the deficiency that results from the inclusion in her and her husband's *205 income for the calendar year 1969 of the amount of Redi's undistributed taxable income for its fiscal year ending August 31, 1969, computed by including in Redi's gross income payments to it under its Federal Government contract. However, since a concession was made by respondent, Decision will be entered under Rule 155.* Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
*. Determined on the basis of 260 work days.↩
2. We note the amount of actual total hours of instruction was only 41,590.↩
3. The contract provided in part the following: Contractor shall submit a report on the hiring and termination of any employee hereunder, a monthly progress and invoice report and a final report. Appropriate forms and reporting instructions will be provided by the Contracting Officer for such reports and any other reports required hereunder. * * *
1. Payment. a. Contractor shall submit certified monthly invoices. Payment shall be based on the total days for which wages were paid under each job title times the fixed unit cost per employee per day within that job title. In no event shall total payments exceed the contract amount, nor shall total payments within a job title exceed the maximum amount for that job title nor shall payments for an employee within a job title exceed the fixed unit cost per employee within that job title; said amounts specified elsewhere in this contract. Cumulative payments for a terminated employee and any substitutes therefor shall not exceed the applicable fixed unit cost per employee. b. In the event an employee terminates for death, incarceration, permanent disability, illness, return to school, military service or acceptance of a job with another employer at a higher rate of pay, the Contractor, upon demonstration of same, shall be paid for all days for which wages were paid up to the date of termination of the employee at the daily fixed unit cost plus 25% of that amount. Such payment is to be computed to the nearest daily multiple. However, in no event may the total fixed unit cost per employee per job title be exceeded. c. No payment shall be made for work performed after the contract completion date or a period of two years from effective date of this contract or June 30, 1970, whichever is earlier. d. Contractor shall maintain records sufficient to support all payments and upon request of the Contracting Officer shall make such records available to the Government. * * *
3. Work Activities, Sites and Conditions. * * *
e. Employees shall be subject to the same rules and regulations and shall receive no less than those benefits applying to all other Contractor employees. * * *
10. Cancellation. a. If Contractor fails to perform under this contract or fails to make sufficient progress so as to endanger performance, the Contracting Officer may cancel the Contract, in whole or in part, upon written notice to the Contractor and his failure to remedy such condition within 10 days of receipt of such notice.In the event of such cancellation, Contractor will be paid to the date of cancellation for each employee hereunder in accordance with the Payment Term. Should it finally be determined that the Contractor has in fact performed properly, then the cancellation will be treated as a termination for convenience. * * *
12. Termination of Employees. Termination of employees does not require Government approval. The Contractor's rights to discipline, suspend or discharge employees shall be in accordance with the Contractor's established rules and regulations and with any applicable collective bargaining agreement. Substitution for terminated employees is permissable. (Sic) * * *
14. Termination for Convenience of the Government. The Contracting Officer by written notice, may terminate the contract, in whole or in part, when it is in the best interest of the Government. In such event, the Contractor shall receive as full payment, for the jobs or job titles terminated, the daily unit cost for all days for which wages were paid prior to termination, plus 25% of that amount. Such payment is to be computed to the nearest daily multiple. However, in no event shall said payment exceed the maximum fixed unit cost for said jobs or job titles. * * *↩
3. Respondent at the trial conceded that this amount was overstated by $4,781.82.↩
4. 42 U.S.C. sec. 2584 (1964) provided as follows: Sec. 2584. On-the-job training. (a) Encouragement, development, and adoption of programs. The Secretary of Labor shall encourage, develop, and secure the adoption of programs for on-the-job training needed to equip persons selected for training with the appropriate skills. The Secretary shall, to the maximum extent possible, secure the adoption by the States and by private and public agencies, employers, trade associations, labor organizations and other industrial and community groups which he determines are qualified to conduct effective training programs under this subchapter of such programs as he approves, and for this purpose he is authorized to enter into appropriate agreements with them.
(b) Training standards. In adopting or approving any training program under this part, and as a condition to the expenditure of funds for any such program, the Secretary shall make such arrangements as he deems necessary to insure adherence to appropriate training standards, including assurances-- (1) that the training content of the program is adequate, involves reasonable progression, and will result in the qualification of trainees for suitable employment; (2) that the training period is reasonable and consistent with periods customarily required for comparable training; (3) that adequate and safe facilities, and adequate personnel and records of attendance and progress are provided; and (4) that the trainees are compensated by the employer at such rates, including periodic increases, as may be deemed reasonable under regulations hereinafter authorized, considering such factors as industry, geographical region, and trainee proficiency. (c) Supplementary classroom instruction. Where on-the-job training programs under this part require supplementary classroom instruction, appropriate arrangements for such instruction shall be agreed to by the Secretary of Health, Education and Welfare and the Secretary of Labor.↩
5. 11 U.S.C. sec. 11(a)(12) provides as follows: Creation of courts of bankruptcy and their jurisdiction (a) The courts of the United States hereinbefore defined as courts of bankruptcy are created courts of bankruptcy and are invested, within their respective territorial limits as now established or as they may be hereafter changed, with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in proceedings under this title, in vacation, in chambers, and during their respective terms, as they are now or may be hereafter held, to-- * * *
(12) Discharge or refuse to discharge bankrupts, set aside discharges, determine the dischargeability of debts, and render judgments thereon; * * *↩